The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Gary Lee DAVIS, a/k/a Gary Lee
Gehrer, Defendant–Appellant.

No. 87SA288.

Supreme Court of Colorado,
En Banc.

May 14, 1990.

As Modified on Denial of Rehearing
July 9, 1990.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert M. Petrusak, Hope P. McGowan, Asst. Attys. Gen., Appellate Section, Denver, Steven L. Bernard, Sp. Asst. Atty. Gen., Adams County Dist. Atty.'s Office, Brighton, for plaintiff-appellee.

Shelley Gilman, Pozner Hutt Gilman Kaplan, P.C., Denver, for defendant-appellant.

Mary G. Allen, Colorado Springs, for amicus curiae Colorado Crim. Defense Bar.

Justice MULLARKEY delivered the Opinion of the Court.

This is a direct appeal pursuant to section 16–11–103(7)(a), 8A C.R.S. (1986), of a death sentence imposed on the defendant Gary Lee Davis following his trial and convictions on charges of first-degree murder, felony murder, conspiracy to commit murder in the first degree, second-degree kidnapping, and conspiracy to commit second-degree kidnapping. Davis does not challenge the guilt phase of his trial but raises numerous points of error in the sentencing phase and challenges the facial constitutionality of the Colorado death sentencing statute. We affirm.

## I.

### *Factual Background*

In the summer of 1986, Gary and Virginia May and their two children, seven-year-old Brandon and four-year-old Krista, lived on a ranch 25 miles northeast of Byers, Colorado in Adams County. The Mays, together with Virginia May's father Rod MacLennan, and her brothers Scott, Dan and Dave MacLennan, were in the ranching business. In February of 1986, the defendant was hired as a ranch hand to work on a ranch which adjoined the ranch operated by the Mays and the MacLennans. The defendant and his wife Becky Davis [1] took up residence in a house owned by the defendant's employer. The Mays lived on the portion of the MacLennan ranch closest to the Davises. According to testimony presented at trial, the Davises met Virginia May at church. The defendant had met Gary May on occasion when the two men worked on a fence line between the properties. The People presented evidence at trial indicating that the defendant often spoke to a fellow employee of his sexual desire for Virginia May, as well as his desire for various other women, including May's sister-in-law Sue MacLennan. The co-worker testified that whenever he and Gary Davis repaired the fence closest to the May residence or were otherwise working in that area, Davis made obscene remarks about his sexual desires for various women. On at least one occasion, according to that witness' testimony, Davis urinated towards the May home and said "[c]ome on, Virginia, baby. I'm here. Come to me." (v. 26, p. 470)

According to the testimony of the defendant, his marital relationship with his wife

1. At the time of the trial, Becky Davis was divorced from Gary Davis and apparently went by the name of Rebecca Fincham. In this opinion, we refer to Fincham as Becky Davis.

Becky had been sexually unsatisfactory. (v. 15, p. 19) Their sexual relationship failed to improve after Davis took the ranch hand job, and the couple began renting pornographic videotapes and cruising about the countryside looking for "a pretty girl." (v. 15, p. 28) The couple sometimes drove around Fort Morgan looking for women and at one point considered, in the defendant's own words, "picking them up and taking them out in the country and ... raping them." (v. 15, p. 30) On this basis, the prosecution argued to the jury that the defendant and his wife, prior to the criminal act here at issue, had determined to kidnap and rape a local woman when the opportunity presented itself. (v. 26, pp. 578–80)

On July 18, 1986, Tammy Beauprez, who lived on a farm ten miles south of Wiggins, Colorado, was visited by a man and woman driving a green four-door sedan with Kansas license plates. After the car pulled into Beauprez's driveway, the woman in the car asked for directions to Byers and inquired of Beauprez whether her husband was home. (v. 26, p. 450) At one point, as Beauprez stood next to the Kansas automobile, the man in the car maneuvered himself into position behind her. However, when Beauprez's husband appeared, the man returned to the car and soon thereafter the couple departed. (v. 26, p. 456) Beauprez identified the couple as Becky and Gary Davis.

In the late afternoon of the following Monday, July 21, 1986, Becky Davis called Sue MacLennan, Virginia May's sister-in-law, and asked whether her husband was home. (v. 26, p. 412) When MacLennan answered that he was not, Becky Davis offered to come by and drop off some used clothes which might be of use to MacLennan's children. The Davises left their home without any children's clothes, the existence of which Gary Davis admitted to have been contrived, but they were in possession of a .22 caliber rifle. (v. 15, pp. 36–37) When they pulled into the MacLennans' driveway, they noted the presence of a male ranch hand, which prompted Becky Davis to state to MacLennan that "I thought your husband wasn't home." Becky Davis stopped briefly to drink iced tea with Sue MacLennan, while Gary Davis stayed in the car. Shortly thereafter, their apparent plan to kidnap Sue MacLennan having been frustrated, the Davises left. (v. 26, p. 418)

At some time between 6:20 and 7:00 p.m., the Davises drove to the nearby May residence. Earlier, Becky Davis had called Virginia May just as she had called Sue MacLennan. Becky Davis told May that they had some children's clothes to give her and promised to deliver the clothes later. (v. 15, p. 32) As the Davises entered the driveway leading to the May home, Virginia May came from the house to greet them, accompanied by her four-year-old daughter Krista. Becky Davis got out of the car and walked with Virginia May around the side of the Mays' tool shed. The defendant then drove the car down to the shed, got out of the vehicle and, as Becky Davis was walking out of the shed, followed by Virginia May, the defendant punched May in the face and forced her into the car. (v. 15, pp. 36–37) Meanwhile, Becky Davis told Krista to go inside; then the Davises, with May as their captive, drove away at a high rate of speed. While Becky Davis drove, the defendant held Virginia May down in the back seat of the car, removed her clothing, and sexually assaulted her.

The Davises took May to a secluded area nearby where the defendant tied a rope around her neck and, leading her by the rope and threatening her with a knife, proceeded to sexually assault her. Subsequently, he forced May to perform oral sex on his wife. After this assault was completed, the defendant struck May in the head with the butt of his rifle; the blow was sufficient to fracture May's skull and to cause hemorrhaging. (v. 26, pp. 496–97). The blow, however, apparently did not cause May to be rendered unconscious. When the defendant shot May, according to expert testimony, the gunpowder residue on May's hands indicated that they were extended toward the defendant in a defensive gesture. (v. 25, p. 390) The defendant shot May several times in the head,

despite her pleas for her life and her offer to pay him $1,000 if she were released. (v. 15, p. 73) When questioned by his wife Becky whether Virginia May was dead, the defendant emptied his rifle into Virginia May, including shots into her left breast and pubic region. (v. 15, p. 37) The defendant and his wife then covered May's corpse with a bale of hay, and returned to their house to pick up their beer cooler because "it had a few more beers in it." (v. 15, p. 38) (testimony of Gary Davis).

Meanwhile, Virginia May's husband Gary, who had been attending a marketing strategy meeting at the Scott MacLennan ranch, returned home at about 8 p.m. He became alarmed when he found his two small children frightened and alone and noticed signs that his wife had left the home abruptly. When informed by his children that his wife was not there because "Becky took her," Gary May attempted to locate his wife. First he called his in-laws, and later, with their assistance, he began to search for her. (v. 26, pp. 46–48) Suspicion immediately focused on the Davises, especially after Sue MacLennan told of her earlier encounter with them. Eventually, May's relatives called the Adams County Sheriff's Department, and a deputy arrived on the scene at about 11 p.m. After taking statements from May's relatives and conducting an initial survey of the Davis residence, the deputy continued to patrol the area when he noted the lights of a car in the distance. After driving to that vehicle, the deputy pulled it over, and, following questioning of its occupants, identified them as the Davises. The deputy questioned the Davises about the May disappearance, and was told that they knew nothing of her whereabouts. (v. 26, pp. 90–91) The deputy allowed the Davises to leave and they then returned home, where for the rest of the night into the next morning, they were under the observation of several of May's relatives. Early that next morning, several of the relatives spoke with the Davises, who denied any knowledge of May's disappearance. They claimed that May was at her home when they left her to go fishing. Becky Davis volunteered her sympathy to the family and expressed the hope that Virginia May would be found. (v. 24, pp. 140–41) On the basis of the children's statement as well as the suspicious behavior of the Davises, that morning Becky and Gary Davis were arrested. (v. 25, p. 219)

On July 23, 1986, Gary Davis, through his court-appointed counsel, reached an agreement with Adams County prosecutors. (v. 11, p. 9) Apparently, Davis represented to his counsel from the Public Defender's office that Virginia May might still be alive. (v. 11, p. 34) Concerned that May might be alive and in need of medical assistance, defense counsel contacted the Adams County District Attorney. In general terms, the prosecutors agreed to allow Davis to plead guilty and to not seek the death penalty in exchange for information on the location of Virginia May. (v. 1, p. 192) The agreement was conditioned, however, on the truthfulness of the defendant's suggestion that there was a possibility that May could be alive. Virginia May's body later was found at the location described by the defendant.

The district court allowed the prosecutor to seek the death penalty, ruling that the defendant had violated the plea agreement by not truthfully relating the circumstances of the offense to the prosecutor. The court found beyond a reasonable doubt that the defendant knew May was dead at the time he entered into the plea agreement with the district attorney. (v. 11, p. 133) The defendant entered a plea of not guilty.[2] Following extended jury selection involving a venire of 105 members, a jury was selected and the trial of the guilt phase went forward over the defendant's objections that he wished to waive a jury trial and to require the judge alone to hear the case.

The defendant was convicted by the jury of all of the charges, and the court, pursu-

2. The defendant does not challenge the correctness of the trial court's decision releasing the prosecution from its promise not to seek the death sentence. As a result of the dispute over the agreement, the Public Defender's office withdrew as counsel for the defendant and the court appointed private counsel to represent him.

ant to section 16–11–103, 8A C.R.S. (1986), conducted the sentencing phase of the bifurcated trial before the jury. After receiving evidence from the prosecution regarding the existence of statutory aggravators and hearing the defendant's evidence and statement in allocution, the jury returned its verdict finding the existence beyond a reasonable doubt of six aggravating factors, that the prosecution had proven beyond a reasonable doubt that there were insufficient mitigating factors to outweigh the aggravating factors, and that death was the appropriate penalty beyond a reasonable doubt. The court then sentenced the defendant to die in the gas chamber. The execution of that sentence, however, was stayed pending this appeal.

The defendant does not challenge the guilt phase of his trial but, on numerous grounds, urges that his death sentence be reversed and a sentence of life imprisonment be imposed. First, the defendant offers several broad challenges to the *per se* constitutionality of capital punishment. Second, the defendant challenges the constitutionality of several aspects of the Colorado death sentencing statute. Third, the defendant challenges the application of our sentencing scheme in this particular case, arguing that several of the statutory aggravators relied upon by the prosecution were invalid and that the court improperly instructed the jury respecting several aspects of our sentencing scheme. Fourth, the defendant argues that the prosecution's closing remarks were improper. Additionally, the defendant makes a number of miscellaneous objections to the procedures followed in this case. We will consider each of the defendant's objections in turn.

## II.

### *Per Se Constitutional Challenge*

#### A. Cruel and Unusual Punishment Under the State Constitution

■ The defendant concedes that a *per se* challenge to capital punishment was rejected by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), but urges us to find that under Article II, Section 20 of the state constitution, which forbids the infliction of "cruel and unusual punishments," the imposition of the death penalty is prohibited. The majority of this court has not addressed the question of whether, despite the constitutionality of capital punishment under certain circumstances under the federal constitution, our state constitution forbids such punishment. However, in *People v. Drake,* 748 P.2d 1237 (Colo.1988), three justices of this court indicated that the Colorado death sentencing statute, as it then existed, was constitutional. Justices Rovira and Vollack in their dissents specifically considered and rejected the defendant's argument that capital punishment was forbidden by the state constitution. In *People v. Tenneson,* 788 P.2d 786 (Colo. 1990), although not directly addressing the question of capital punishment under the state constitution, this court reviewed the present statute under the standards developed by the United States Supreme Court in *Gregg* and more recent cases. Using the federal capital punishment jurisprudence as our guide, we interpreted several aspects of our death sentencing scheme. *See Tenneson,* 788 P.2d at 794 (court holds that in light of constitutional need for reliability in death sentencing, section 16–11–103(2)(a)(II), 8A C.R.S. (1986), must be construed to require the prosecutor to prove beyond a reasonable doubt that mitigating factors do not outweigh aggravating factors). Implicit in the *Tenneson* decision is the assumption that there exists no independent basis under the state constitutional provision forbidding cruel and unusual punishment on which to base a *per se* challenge to capital punishment.

Further, in other contexts we have not adopted an analysis of our constitutional provision forbidding cruel and unusual punishment which differs from that followed by the United States Supreme Court with respect to the Eighth Amendment. In *People v. Gutierrez,* 622 P.2d 547, 556 (Colo. 1981), we rejected the defendant's argument that, even though Colorado's Habitual Criminal Act, sections 16–13–101 to –103, 8A C.R.S. (1986 & 1989 Supp.), did not violate the Eighth Amendment's pro-

scription of cruel and unusual punishment, Colo. Const. Art. II, Sec. 20 offered "greater protection" under its cruel and unusual punishment provision. Thus, the precedents of this court indicate our disinclination to accept the defendant's argument for invalidating capital punishment in all cases under the Colorado Constitution. Moreover, and more importantly, we are persuaded that the United States Supreme Court in *Gregg* properly concluded that capital punishment in every instance does not constitute cruel and unusual punishment. The arguments which the defendant offers here are nearly identical to the arguments offered in *Gregg* and rejected by the Court.

First, the defendant argues that capital punishment is unconstitutional because it is offensive to Colorado's contemporary standards of decency. In determining the nature of those contemporary standards, the defendant urges that we "consider the morality our society espouses and follows." He assures us that "this Court need not be concerned that it is merely substituting its personal sense of morality for legislative judgment and popular sentiment." *Defendant's Brief* at 171. However, he does not explain how we are to determine the nature of contemporary standards of decency without regard to legislative judgment and popular sentiment but also avoid substituting our personal sense of morality for that of the majority of the people.

We have recognized that the power to determine the proper punishment for violations of statutes is legislative and not judicial. *People v. Summit,* 183 Colo. 421, 517 P.2d 850 (1974). Whether we individuals who are judges would have voted for the death penalty as voters or legislators is not relevant. In considering the question of whether capital punishment is inconsistent with the contemporary standards of decency, we cannot ignore the fact that throughout the history of this state, capital punishment has been utilized as the penalty for certain crimes. Early decisions of this court upheld the imposition of the death penalty. *See Smith v. People,* 1 Colo. 121 (1869) (affirming conviction for murder; sentence of death mandatory). In short, the imposition of the death penalty has a long history of acceptance in Colorado. *Drake,* 748 P.2d at 1262, n. 4 (Rovira, J., concurring in part and dissenting in part). Whenever the question was presented to the people directly through an initiative or referendum, or indirectly through their elected representatives, the people have opted to reaffirm their support for the imposition of capital punishment in certain cases.[3]

For example, on November 8, 1966, the voters were presented with the question of "[s]hall capital punishment be abolished?" By nearly a 2–1 margin the voters favored retaining the death penalty. Following the decision of the United States Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the voters were again asked to give their opinion on whether capital punishment was appropriate.[4] By a large margin, voters approved the continued use of capital punishment. The legislature's quick response to *Furman,* in adopting a death penalty statute, was invalidated by this court in *People v. District Court,* 196 Colo. 401, 586 P.2d 31 (1978), because the statute did not sufficiently allow the defendant to present mitigating circumstances as required by the United States Supreme Court's decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In 1979, the legislature amended the 1974 statute to address the concerns raised

3. Colorado has had the death penalty since 1861, with the exception of a four-year period between 1897 and 1901 when it was abolished and then restored following three lynchings. Colorado Legislative Council, *An Analysis of 1966 Ballot Proposals,* Research Publication No. 110, at 32.

4. The November 5, 1974 proposition was phrased as follows: "Shall the death penalty be imposed upon persons convicted of class 1 felonies where certain mitigating circumstances are not present and certain aggravating circumstances are present?"

in *People v. District Court*.[5] This frequent reaffirmance of the desirability of capital punishment as the penalty for certain crimes answers completely the defendant's objection that capital punishment offends the contemporary standards of decency of Colorado citizens. As noted by Justice Rovira in the *Drake* case:

> The citizens of Colorado, directly and through their elected representatives, have repeatedly declared their support of the death penalty. They have expressed the values of the community. Since contemporary community values are the test, their view must be accepted as the standard by which to measure a claim that the death penalty is offensive to contemporary standards of decency in Colorado.

*Drake*, 748 P.2d at 1263 (Rovira, J., concurring in part and dissenting in part).

We are unwilling to follow the defendant's suggestion that this court reject the judgment of the legislature and of the people on the propriety of capital punishment: "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Gregg*, 428 U.S. at 175, 96 S.Ct. at 2926, *quoting Furman*, 408 U.S. at 383, 92 S.Ct. at 2800 (Burger, C.J., dissenting). We reject the defendant's *per se* challenge to capital punishment.[6]

B. Per Se Constitutional Challenge: Section 16–11–103

■ As in *Gregg*, the defendant here also argues that the Colorado capital sentencing scheme violates constitutional guarantees of due process as well as the prohibition against cruel and unusual punishment by allowing excessive discretion in turn, to the prosecutor, who determines against whom to seek a death sentence, to the jury, which determines who is to receive a sentence of death, and to the governor, who determines whether clemency might be appropriate. The Supreme Court in *Gregg* rejected this very argument stating:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

*Gregg*, 428 U.S. at 199, 96 S.Ct. at 2937. *See also McCleskey v. Kemp*, 481 U.S. 279, 307, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987) (Court reaffirms holding of *Gregg* that allowing discretion at each stage of the decision to impose capital punishment is constitutional). We find persuasive the analysis of the Supreme Court and hold that the discretion afforded to the prosecutor, the jury, and the governor under our statutes and under our constitution does not violate either Section 25 or Section 20 of Article II of our constitution.

5. Section 16–11–103, the provision governing sentencing in capital cases, was again amended in 1984, 1985, 1987, 1988, and in 1989.

6. Since the adoption in 1979 of the death sentencing statute following this court's invalidation of a prior death sentencing scheme in *People v. District Court*, 196 Colo. 401, 586 P.2d 31 (1978), this court has considered only three cases, including this one, in which a death sentence was imposed. *See People v. Durre*, 690 P.2d 165 (Colo.1984) (court reverses death sentence on basis that jury instructions did not clearly indicate the need for unanimity in imposing death sentence); *People v. Drake*, 748 P.2d 1237 (Colo.1988) (court reverses death sentence on basis that instructions to jury did not properly inform it that jury's decision would determine whether death would be imposed). We note that all cases in which a death sentence is given are subject to automatic direct review in this court. § 16–11–103(7)(a), 8A C.R.S. (1986).

The defendant also argues that our death penalty is unconstitutional because it violates due process in that it is not the least drastic means of fulfilling the state's interest. However, we may not strike down a particular penalty, "because we deem less severe penalties adequate to serve the ends of penology." *Gregg,* 428 U.S. at 182–83, 96 S.Ct. at 2929, *quoting Furman,* 408 U.S. at 451, 92 S.Ct. at 2835 (Powell, J., dissenting). Further, retribution itself is not a forbidden objective of penology. *Gregg,* 428 U.S. at 183, 96 S.Ct. at 2929. With respect to this penological purpose, the legislature may well have concluded that it could not be achieved through less stringent means. "In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct." *Id.*

The defendant next argues that the use of lethal gas as a method of execution in Colorado constitutes cruel and unusual punishment. However, the defendant did not present this argument below where he might have developed an evidentiary basis for this claim. Thus, we are left with a *per se* challenge to the practice of using lethal gas to execute a person. In *Gray v. Lucas,* 710 F.2d 1048 (5th Cir.), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983), the court of appeals rejected the defendant's argument that Mississippi's practice of carrying out death sentences through the use of cyanide gas constituted cruel and unusual punishment. The court noted that:

> Traditional deaths by execution, such as by hanging, have always involved the possibility of pain and terror for the convicted person. Although contemporary notions of civilized conduct may indeed cause some reassessment of what degree or length is acceptable, we are not persuaded that under the present jurisprudential standards the showing made by [the defendant] justifies this intermediate appellate court holding that, as a matter of law or fact, the pain and terror resulting from death by cyanide gas is so different in degree or nature from that resulting from other traditional modes of execution as to implicate the eighth amendment right.

*Gray,* 710 F.2d at 1061. *Accord, Calhoun v. State,* 297 Md. 563, 468 A.2d 45 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Billiot v. State,* 454 So.2d 445 (Miss.1984), *cert. denied,* 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369 (1985). Also, the United States Supreme Court in the nineteenth century rejected Eighth Amendment challenges to a number of methods of execution including the electric chair, *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890), and the firing squad, *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1879). The Supreme Court has shown no inclination to reexamine this area of the law. We see no basis for finding that execution by lethal gas is distinguishable from those other, permissible forms of execution. Thus we find that the defendant's contention is without merit.

The defendant also argues that our death penalty scheme is unconstitutional because it precludes this court from conducting a proportionality review. While acknowledging that the United States Supreme Court in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), held that such review is not mandated by the federal constitution, the defendant urges that we hold that a "proportionality" review is compelled by our state constitution's due process and cruel and unusual punishment clauses. We decline to do so.

It is important to define the type of proportionality review which the defendant urges is required by our constitution. As observed by the Court in *Harris,* "proportionality" traditionally referred to "an abstract evaluation of the appropriateness of a sentence for a particular crime," *Harris,* 465 U.S. at 42–43, 104 S.Ct. at 875. To conduct this type of proportionality review, courts look "to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions...." *Harris,* 465 U.S. at 43, 104 S.Ct. at 875. We have previously engaged in this type of proportionality review, *see Gutierrez,* 622 P.2d 547, 556, and to an extent

are required to engage in such review pursuant to section 16–11–103(7)(a) and (b), 8A C.R.S. (1986). (*See* discussion, below, at 212–213.)

The type of proportionality review which the defendant argues is required by the state constitution, and which the Court in *Harris* held was not required by the federal constitution, inquires into whether the punishment imposed is "disproportionate to the punishment imposed on others convicted of the same crime." *Harris,* 465 U.S. at 43, 104 S.Ct. at 876. In this type of proportionality review, according to the defendant, the reviewing court considers similar cases throughout the state, not only those in which the death sentence is imposed but also those in which the sentence of life imprisonment is imposed.

As the defendant acknowledges, this court is not well equipped to conduct this sort of "proportionality" review. Unlike other states in which such a review is conducted, here no mechanism has been established for collecting the relevant data from across the state as to cases in which the death sentence was sought or could have been sought, and the factual circumstances surrounding those cases, so that this court could conduct a meaningful review of whether the sentence in a particular case is proportional when compared with all similar cases in Colorado.[7] Because of this inability to conduct such a review, the defendant argues we must reverse his death sentence. We disagree. We do not believe that the legislature's failure to provide for such review violates this state's constitution.

■ The defendant also claims, without offering any evidence, that the death penalty is disproportionately imposed on the poor, on blacks, and on members of unpopular groups. The United States Supreme Court in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), rejected a similar equal protection challenge to Georgia's death sentencing scheme as applied. The defendant in *McCleskey* introduced evidence showing, among other things, that in Georgia a person who murdered a white victim was 4.3 times more likely to receive a death sentence than a person charged with killing a black victim. *McCleskey,* 481 U.S. at 287, 107 S.Ct. at 1764. The Court rejected the defendant's argument that these statistics were sufficient to compel an inference that the sentencing rested on purposeful discrimination. *McCleskey,* 481 U.S. at 297, 107 S.Ct. at 1769. Here the defendant does not have any statistical support similar to that present in *McCleskey* and we are aware of no such data. Thus we reject his claim.

■ The defendant also argues that section 16–11–103 violates the due process clauses of the state and federal constitutions. He claims that the statutory mitigating circumstances established by section 16–11–103(5)(b)–(e) are impermissibly vague. Section 16–11–103(5) states in relevant part:

> (5) For purposes of this section, mitigating factors shall be the following factors:
>
> . . . . .
>
> (b) [The defendant's] capacity to appreciate wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or
>
> (c) He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or
>
> (d) He was a principal in the offense which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or

7. For example, Georgia provides for the collection of records in "all capital felony cases" throughout the state over a period of time. *See* GA.CODE ANN. § 17–10–37 (1982), discussed in *Gregg,* 428 U.S. at 223, 96 S.Ct. at 2948 (White, Rehnquist, JJ., and Burger, C.J. concurring in judgment). *See also Tichnell v. State,* 287 Md. 695, 715, 722–26, 415 A.2d 830, 847, 852–55 (1980), discussing Maryland Rule 772A, requiring the submission to the Maryland Court of Appeals an "extensive report in every case where the death penalty is sought, whether or not it is imposed," which provides "detailed information concerning the defendant, the offense, the victim, and the circumstances of the trial."

(e) He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person;....

The defendant asserts that section 16-11-103(5), as quoted above, is so vague that it fails to meet the minimal requirements of certainty and clarity required by the due process clause. He argues that these mitigators fail to give the defendant and the jury adequate notice of "what conduct will subject him to or exclude him from the death penalty." *Defendant's Brief* at 187. We reject the defendant's argument.

In *Drake*, the defendant made the same argument now urged to this court. Although the majority, in light of its decision reversing the defendant's death sentence, found it unnecessary to consider the issue, Justice Rovira addressed and rejected this argument:

> The type of conduct referred to in subsections 5(b) through (e), capacity to appreciate wrongfulness of conduct, duress, minor participation and creating a grave risk of death, are set out in words that are common and easily understood by persons familiar with the English language. The words can be understood in light of the duty of the fact finder to consider whether the defendant's conduct comes within their meaning.

*Drake*, 748 P.2d at 1267 (Rovira, J., concurring in part and dissenting in part). The four statutory mitigators which Justice Rovira considered in *Drake* were numbered and worded identically to the four mitigators now challenged by the defendant.[8] We agree that the mitigators are sufficiently precise to guide the jury in determining whether the death penalty ought to be imposed. Thus, we reject the defendant's argument.

## III.

### *Aggravating Factors*

The defendant challenges the use by the People in this case of certain of the statutory aggravators established by section 16-11-103(6). Specifically, he challenges aggravators established by section 16-11-103(6)(a), (d), (e), (g), (j) and (k).[9] Further, the defendant argues that if any single statutory aggravator used in this case is invalidated by this court, then we

8. We note, however, that under the sentencing scheme relevant in *Drake*, section 16-11-103, 8A C.R.S. (1978 & 1983 Supp.), the court was forbidden to impose a sentence of death on the defendant if the sentencing hearing resulted in a finding that at the time of the offense any of the factors listed in subsections (5)(a) through (e) existed. *See Drake*, 748 P.2d at 1252 n. 5. That section now has been revised so as to delete the statutory language mandating a sentence of life imprisonment if any of the mitigators of subsections (5)(a) through (e) are found to exist. Ch. 120, Sec. 3, § 16-11-103, 1984 Colo.Sess.Laws 491, 493-94. Under the sentencing scheme applicable in this case, if the jury finds the existence of one or more of the statutory mitigators listed in subsections (5)(a) through (e), it may still return a sentence of death provided that it concludes that the mitigators do not outweigh the aggravators and that death is the appropriate penalty beyond a reasonable doubt. § 16-11-103(2)(a).

9. Section 16-11-103(6), 8A C.R.S. (1986), provided in relevant part:

> For purposes of this section, aggravating factors shall be the following factors:
>
> (a) The class 1 felony was committed by a person under sentence of imprisonment for a class 1, 2, or 3 felony as defined by Colorado law or United States law, or for a crime committed against another state or the United States which would constitute a class 1, 2, or 3 felony as defined by Colorado law; or
>
> . . . . .
>
> (d) The defendant intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him; or
>
> (e) The defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed; or
>
> . . . . .
>
> (g) The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; or
>
> . . . . .
>
> (j) The defendant committed the offense in an especially heinous, cruel, or depraved manner; or
>
> (k) The class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody. This factor shall include the intentional killing of a witness to a criminal offense.

must set aside the defendant's death sentence and return this case to the district court so that the defendant might be sentenced to life imprisonment. However, we conclude, for the reasons discussed below, that the invalidation of a statutory aggravator considered by the jury in passing sentence does not require an automatic reversal of defendant's sentence provided this court concludes, beyond a reasonable doubt, that the consideration of the aggravator by the jury was harmless error. We now examine the aggravators to which the defendant objects.

A. Heinous, Cruel or Depraved

In *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the court of appeals held that Oklahoma's "especially heinous, atrocious, or cruel" aggravator was improper because "[t]here is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence," *Cartwright,* 822 F.2d at 1489, *quoting Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980). The court found the use of this aggravator unconstitutional despite the fact that Oklahoma had further defined those terms.[10] The Supreme Court in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), affirmed the Tenth Circuit decision. The Court noted that the case was controlled by its decision in *Godfrey,* which reversed a Georgia death sentence based upon an aggravator that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." *Cartwright,* 486 U.S. at 362, 108 S.Ct. at 1858, *quoting Godfrey,* 446 U.S. at 422, 100 S.Ct. at 1762. The language in the Oklahoma statute, allowing the imposition of the death penalty if the jury found that the crime was "especially heinous, atrocious or cruel," gave no more guidance to the jury than the language in the Georgia aggravator disapproved of in *Godfrey,* the Court found. 486 U.S. at 364, 108 S.Ct. at 1859. Thus, the use of such language was impermissible.

We find that the language in section 16–11–103(6)(j), providing that an aggravator exists if the offense was committed in "an especially heinous, cruel or depraved manner" is indistinguishable from the language used in the Oklahoma aggravator considered in *Cartwright,* and thus we conclude that the trial court improperly allowed the jury to consider this statutory aggravator.

The prosecutor argues and we agree that this court may construe these statutory terms in a narrowing fashion to provide constitutionally sufficient guidance to a jury. In *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court upheld Florida's aggravator that the crime was "especially heinous, atrocious or cruel," in light of the Florida Supreme Court's construction of that aggravator to include only crimes which are "conscienceless or pitiless" and "unnecessarily torturous to the victim." *Proffitt,* 428 U.S. at 255, 96 S.Ct. at 2968, *quoting State v. Dixon,* 283 So.2d 1, 9 (Fla.1973). Thus the terms "especially heinous, cruel or depraved" may sufficiently guide the jury if more narrowly limited in their scope.

We believe that the construction given the terms "especially heinous, atrocious or cruel" by the Florida court in *Dixon* and approved by the Supreme Court in *Proffitt* appropriately describes the type of crimes which our legislature, in adopting the aggravator "especially heinous, cruel or depraved," thought worthy of consideration for the death sanction. We hold that under section 16–11–103(6)(j), as it stood at the time the defendant murdered Virginia May, the prosecutor could prove the existence of this aggravator by showing that the defendant committed the crime in a "conscienceless or pitiless" manner which

10. Oklahoma defined "heinous" as "extremely wicked or shockingly evil" and "atrocious" as "outrageously wicked and vile." *Cartwright v. Maynard,* 822 F.2d at 1489.

was "unnecessarily torturous to the victim." [11]

The People suggest that by appropriately narrowing the definition of these terms, this court can "cure" their improper application in this case. To the extent the People imply that an appropriately narrowing construction of these terms automatically cures a trial court's error in submitting an unconstitutionally vague aggravator to the jury, we disagree. The construction of the terms we adopt today was not given to the jury, and thus we cannot automatically conclude that, in the absence of such instructions, the jury properly applied the law. *See Mills v. Maryland,* 486 U.S. 367, 369, 108 S.Ct. 1860, 1863, 100 L.Ed.2d 384 (1988) (although Maryland Court of Appeals may have arrived at a construction of its sentencing statute which preserves its constitutionality, Court had no reason to believe jury arrived at the same construction, thus death sentence reversed); *Godfrey v. Georgia,* 446 U.S. 420, 436–37, 100 S.Ct. 1759, 1768–69, 64 L.Ed.2d 398 (1980) (Marshall, J., concurring) (it is not enough for reviewing court to apply narrowing construction of ambiguous statutory language; the jury must be instructed on the proper narrow construction of the statute).

Although we find that the trial court erred in allowing the jury to consider the aggravator "especially heinous, cruel or depraved," without providing a limiting construction to those terms, this does not end our inquiry. The invalidation on appeal of a statutory aggravator does not necessarily require the reversal of a death sentence. In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court held that even though the jury had improperly considered as an aggravator whether the defendant had a "substantial history of serious assaultive convictions," the Court was not required to reverse the defendant's death sentence.[12] In its opinion, the Court carefully explained why the aggravator was invalid:

> It is not invalid because it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected. Georgia has not, for example, sought to characterize the display of a red flag, cf. *Stromberg v. California,* [283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931)], the expression of unpopular political views, cf. *Terminiello v. Chicago,* 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131] (1949), or the request for trial by jury, cf. *United States v. Jackson,* 390 U.S. 570 [88 S.Ct. 1209, 20 L.Ed.2d 138] (1968), as an aggravating circumstance. Nor has Georgia attached the "aggravating" label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, cf. *Herndon v. Lowry,* 301 U.S. 242 [57 S.Ct. 732, 81 L.Ed. 1066] (1937), or to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness. Cf. *Miller v. Florida,* 373 So.2d 882, 885–886 (Fla.1979). If the aggravating circumstance at issue in this case had been invalid for reasons such as these, due process of law would require that

**11.** We note that in 1989 the legislature amended section 16–11–103 to define the terms here at issue. Section 16–11–103(6.5), 8A C.R.S. (1989 Supp.) defines these terms as follows:

(a) "Cruel" means intentional infliction of physical or psychological torture, and includes the pitiless infliction of pain or suffering with utter indifference to, or the enjoyment of, the suffering of others.

(b) "Depraved" means senseless or committed without purpose or meaning, or that the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing.

(c) "Heinous" means using a particularly shocking or brutal method of killing, or a killing in which the victim is unable to physically defend himself because of a physical or mental disability or because he is too old or too young.

We need not determine here whether the definitions adopted by the legislature, not in effect at the time of May's murder, sufficiently narrow these statutory terms.

**12.** The Georgia Supreme Court in *Arnold v. State,* 236 Ga. 534, 539–42, 224 S.E.2d 386, 391–92 (1976), held this aggravator to be unconstitutionally vague.

the jury's decision to impose death be set aside.

*Zant,* 462 U.S. at 885, 103 S.Ct. at 2747. The Court went on to note that:

[A]ny evidence on which the jury might have relied in this case to find that respondent had previously been convicted of a substantial number of serious assaultive offenses, as he concedes he had been, was properly adduced at the sentencing hearing and was fully subject to explanation by the defendant.... This case involves a statutory aggravating circumstance, invalidated by the State Supreme Court on grounds of vagueness, whose terms plausibly described aspects of the defendant's background that were properly before the jury and whose accuracy was unchallenged.

*Zant,* 462 U.S. at 887, 103 S.Ct. at 2748 (citations omitted).

Thus, the Court concluded, the only impact which the erroneous use of the statutory aggravator could have had on the jury was "merely a consequence of the statutory label 'aggravating circumstance.'" The Court agreed with the Georgia Supreme Court that the "mere fact that some of the aggravating circumstances presented were improperly designated 'statutory'" had "an inconsequential impact on the jury's decision regarding the death penalty." *Zant,* 462 U.S. at 888–89, 103 S.Ct. at 2749, *quoting Zant v. Stephens,* 250 Ga. 97, 100, 297 S.E.2d 1, 4 (1982).

The Court's holding in *Zant* was in part based on a particular aspect of Georgia's sentencing scheme unique to that state. In Georgia, unlike in Colorado, the existence of an aggravating factor is only utilized to narrow the class of death eligible persons. *Zant,* 462 U.S. at 870–73, 103 S.Ct. at 2739–41. There is no requirement that the jury balance aggravating circumstances against mitigating circumstances. *Id.* The Court noted this difference and reserved decision on the question of whether an invalid aggravating circumstance, under a statute where aggravators are weighed against mitigators, would require a reversal of a death sentence. *Zant,* 462 U.S. at 890, 103 S.Ct. at 2749.

In *Clemons v. Mississippi,* — U.S. —, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the Court addressed the question left open in *Zant.*[13] In *Clemons,* the jury was allowed to consider as an aggravator that the murder in that case was "especially heinous, atrocious or cruel." *Clemons,* 110 S.Ct. at 1444. The jury was not given any instruction further defining those terms. On review of Clemons' sentence, the Mississippi Supreme Court recognized that under the Supreme Court's decision in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the submission to the jury of the "especially heinous, atrocious or cruel" aggravator was improper because the aggravator was unconstitutionally vague and did not provide sufficient guidance to the jury in deciding whether to impose a death sentence. *State v. Clemons,* 535 So.2d 1354 (1988). The Mississippi court, however, declined to reverse the defendant's conviction finding "beyond a reasonable doubt ... the jury's verdict would have been the same with or without the 'especially heinous, atrocious or cruel' aggravating circumstance." *Clemons,* 535 So.2d at 1364.

As in Colorado, under the Mississippi sentencing scheme examined by the Court in *Clemons,* the jury is required to weigh any mitigating factors against aggravating factors. The Court acknowledged that the Mississippi scheme was different from the Georgia scheme examined in *Zant,* but found that the differences did not dictate a different result. The Supreme Court first

13. Prior to the *Clemons* decision, in *Coleman v. Saffle,* 869 F.2d 1377 (10th Cir.1989), the Tenth Circuit Court of Appeals considered the decision of the Oklahoma Supreme Court in *Stouffer v. State,* 742 P.2d 562 (Okla.Crim.App.1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988), declining to reverse the defendant's death sentence although the jury had been improperly permitted to consider as an aggravator that the murder had been "especially heinous, atrocious or cruel," without any limiting construction. The court of appeals agreed, in light of the overwhelming evidence of guilt, the fact that the remaining four aggravators were strongly supported by the evidence, and that there was no mitigating evidence, that the error in allowing the jury to consider the unconstitutionally vague aggravator was harmless.

considered whether, in principle, the constitution permits an appellate court in a "weighing state" to uphold a death sentence despite the consideration by the jury of an improper statutory aggravator. The Court held that there is "nothing in appellate weighing or reweighing of the aggravating and mitigating circumstances that is at odds with contemporary standards of fairness or that is inherently unreliable and likely to result in arbitrary imposition of the death sentence." *Clemons,* 110 S.Ct. at 1449. Recognizing that the reweighing of aggravators and mitigators might be inappropriate under the law of the state, the Court also held that "it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless." *Id.* at 1450. The Court acknowledged the statement of the Mississippi Supreme Court that: "We likewise are of the opinion beyond a reasonable doubt that the jury's verdict would have been the same with or without the 'especially heinous, atrocious or cruel' aggravating circumstance." *Id. (quoting State v. Clemons,* 535 So.2d at 1364). The Court agreed that harmless error analysis could be approached in this fashion, but under such a test found the conclusion of the Mississippi court "very difficult to accept." *Id.* The Court determined, however, that there was an alternative approach to harmless error analysis that might be appropriate in the *Clemons* case:

> It is perhaps possible, however, that the Mississippi Supreme Court intended to ask whether beyond reasonable doubt the result would have been the same had the especially heinous aggravating circumstance been properly defined in the jury instructions; and perhaps on this basis it could have determined that the failure to instruct properly was harmless error.

*Clemons,* 110 S.Ct. at 1441. Because the Court could not determine whether the Mississippi Supreme Court had taken this approach to harmless error analysis, the Court remanded the case.

The Supreme Court's decision in *Clemons* is dispositive of the defendant's assertion that the federal constitution requires that if we find a single aggravator to have been improperly submitted to the jury, we must reverse his sentence. Under *Clemons,* when a jury has improperly considered an aggravator in determining whether death is the appropriate sentence, an appellate court has three options. First, it may "reweigh" the aggravators and mitigators and determine whether death is appropriate. Second, it may apply "harmless error" analysis by considering whether, if the jury had not considered the invalid aggravator, it nonetheless would have sentenced the defendant to death. Finally, where the aggravator considered by the jury was improper because it was not given a constitutionally narrow construction, the reviewing court may apply another form of "harmless error" analysis and uphold the sentence if it finds, beyond a reasonable doubt, that had the aggravator properly been narrowed the jury would have returned a verdict of death. In this case, we elect to proceed under the third approach.

We have held that the aggravator "especially heinous, cruel or depraved" should have been limited to include only those murders which were conscienceless or pitiless, and were unnecessarily torturous to the victim. *See above,* at 176–177. We believe that the evidence presented here shows that the defendant's murder of Virginia May was "especially heinous, cruel or depraved." Virginia May was stalked, captured, abused and, finally, killed to fulfill the defendant's sexual fantasies. The defendant forcibly kidnapped Virginia May in front of her four-year-old daughter, Krista. He sexually assaulted her in the car as Becky Davis drove away from the May home. The defendant testified that he forced May to perform oral sex on his wife, as he led May about with a rope tied around her neck. (v. 15, p. 37) The defendant also testified that he raped May, and upon completing that assault, struck her in the head with the butt of his rifle. (*Id.*) The blow did not render May unconscious and, despite May's pleading and an offer of money in exchange for her life (v. 15, p. 73), the defendant emptied his rifle into her. Her face and torso were mutilated by

the shots. Some fourteen hollow-point bullets, which expand on impact, were found in her body including shots into her breast and pubic region. (v. 26, pp. 493–94) The humiliation, terror, and physical suffering which the defendant caused Virginia May in committing this crime convince us beyond a reasonable doubt that, had the jurors properly received an instruction limiting these terms, they nonetheless would have concluded that the defendant committed the crime in an especially heinous, cruel, or depraved manner. Thus, the trial court's failure to instruct the jury on the definition of those terms was harmless error.[14]

B. Under Sentence of Imprisonment

The defendant also objects to the trial court's application of section 16–11–103(6)(a), which provides that a statutory aggravator exists if the crime was committed while the defendant was "under sentence of imprisonment" for the commission of a class 1, 2, or 3 felony. The information charged the defendant with having committed the offenses in this case between July 21 and July 23, 1986. The evidence presented at trial indicated that the defendant was on parole following his incarceration for first-degree sexual assault. According to the testimony of defendant's parole officer during the sentencing hearing, the defendant was scheduled to be released from parole on July 22, 1986, the day after Virginia May was abducted by the defendant. (v. 2A, p. 15) The trial court told the jury in Instruction No. 14 that a "person on felony parole is by law deemed to be still under sentence of imprisonment for the felony that caused him originally to be sentenced." The defendant argued at trial that the term "under sentence of imprisonment" does not include the period in which a defendant is on parole following his release from prison. The defendant urges that we narrowly construe the statutory aggravator to include only periods in which a defendant is confined in a correctional institution. This interpretation is supported, the defendant asserts, by legislative history indicating that a principal drafter of the death penalty bill testified that the "intention behind the aggravator in the present bill is that if a person is in prison serving a felony sentence and murders somebody, then he ought to be, that ought to be an aggravated circumstance." *Defendant's Brief* at p. 44, *quoting* testimony of El Paso County Deputy District Attorney Steve Henry on H.B. 1310, *Audiotape of Hearing before Senate Judiciary Committee,* 54th General Assembly, Second Session, February 29, 1984, 2:06 p.m. The defendant argues that this testimony indicates conclusively that the legislature intended that this aggravator be limited to murders committed by persons in prison and not by those released on parole. We are not persuaded.

In interpreting a statute, our primary task is to give effect to the intent of the legislature. *Kern v. Gebhardt,* 746 P.2d 1340 (Colo.1987). To discern such intent, this court looks to the language of the statute according to its plain and ordinary meaning. *Id.* If the language is ambiguous, we consider its legislative history, the state of the law prior to enactment, the problem addressed, and the statutory remedy. *See Civil Rights Comm'n v. North Washington Fire Protection Dist.,* 772

14. Our holding that the improper submission of this aggravator to the jury without a limiting instruction was harmless beyond a reasonable doubt is bolstered by several factors. First, as in *Clemons* and in *Zant,* the use of this aggravator did not permit the jury to consider improper evidence. On the contrary, all of the evidence useful to prove that the crime was especially heinous, cruel or depraved, *i.e.,* the facts and circumstances surrounding the kidnapping and murder of Virginia May, were admissible at the sentencing stage and were properly considered by the jury in determining whether death was the appropriate sentence. § 16–11–103(1)(b). Further, there is nothing *per se* improper about the words "cruel," "depraved" and "heinous," even without narrowing instructions. Thus, it would have been proper for the prosecutor in closing argument to characterize the crime as "heinous, cruel or depraved" even if there were no specific aggravator utilizing such terms. Finally, much of the evidence indicating that the defendant's murder of May was "heinous, cruel or depraved" was admissible to establish the existence of the other statutory aggravators including the "kidnapping" aggravator, the "felony murder" aggravator, and the "preventing a lawful arrest" aggravator.

P.2d 70, 78 (Colo.1989). As the defendant points out, the legislative history here indicates that the "under sentence of imprisonment" aggravator was intended to cover persons who are in prison at the time they commit the class 1 felony. However, this is not the end of the inquiry. The defendant has not shown any legislative history indicating that this was the sole purpose of the legislature in adopting this aggravator. Thus, we must determine whether the legislature also intended to include the period of parole following release from incarceration in the phrase "under sentence of imprisonment."

Additional principles of statutory interpretation are useful here. When the legislature adopts a statute, we must presume that it acted with an awareness of prior decisional law on the subject matter under inquiry. *People ex rel. Danielson v. City of Thornton,* 775 P.2d 11 (Colo.1989); *People v. Green,* 734 P.2d 616 (Colo.1987). In *People v. Salvador,* 189 Colo. 181, 539 P.2d 1273 (1975), this court considered the issue of whether a defendant who has been released from prison on parole is still "under sentence." The Attorney General in that case urged that we reject the defendant's post-conviction collateral attack because the defendant had completed serving his sentence. We disagreed, holding that the defendant's "release on parole in no way alters the fact that he is still under sentence; that he is in technical custody; and that he is under supervision." *Salvador,* 189 Colo. at 183, 539 P.2d at 1275. The *Salvador* opinion was issued in 1975; the legislature adopted this aggravator in 1984. The defendant has not shown any basis for concluding that the legislature did not intend that the term "under sentence" should be given the construction we gave that term in *Salvador. See also People v. Lucero,* 772 P.2d 58, 60 (Colo.1989) (a parolee is one who has been conditionally released from actual custody but is, in the contemplation of the law, still in legal custody and constructively a prisoner of the state); § 17-22.5-203(2), 8A C.R.S. (1986) (a person on parole who "behaves and conducts himself as not to incur his reincarceration ... shall be deemed to be still serving out the sentence imposed upon him....").

The defendant also argues that the interpretation urged by the prosecutor must be rejected because a 1988 amendment to section 16-11-103(6)(a), adding the phrase "including the period of parole or probation" to the term "while under sentence of imprisonment" demonstrates conclusively that prior to this amendment, the aggravator did not include the period of parole.[15] Although, as the defendant indicates, "when a statute is amended, it is presumed that the legislature intended to change the law," *Charnes v. Lobato,* 743 P.2d 27, 30 (Colo.1987), this presumption may be rebutted when arguably more specific sections are added to a general section. In such a case, the legislature may intend to clarify the existing statute. *People v. Hale,* 654 P.2d 849, 851 (Colo.1982); *see also* Sands, *Sutherland on Statutes and Statutory Construction* § 22.30 (4th Ed.1985 Rev.). Here, the legislature's addition of the term "including the period of parole" indicates that it must have believed that the period of parole was part of a sentence of imprisonment. If the drafters of the 1988 amendment thought the period of parole was separate from the period in which a person is under sentence of imprisonment, they could have used the words "and" or "as well as" or the words "or during." The use of the clarifying term "including" as well as our prior precedent holding that the period of parole is part of the period of the sentence, leads us to the conclusion that the period of parole is included in the phrase "while under sentence of imprisonment."

We also are persuaded that the legislative policy served by applying this provision to defendants who are incarcerated at the time they commit a class 1 felony is also served by applying the provision to persons on parole. Persons on parole from

15. As amended, section 16-11-103(6)(a) states in relevant part: "The class 1 felony was committed by a person under sentence of imprisonment including the period of parole, or on probation, for a class 1, 2, or 3 felony...." Section 16-11-103(6)(a), 8A C.R.S. (1989 Supp.).

a sentence for a class 1, 2, or 3 felony as a class "pose a greater threat of criminal activity to law enforcement authorities than ordinary citizens." *People v. Anderson,* 189 Colo. 34, 37, 536 P.2d 302, 304 (1975). Incarcerated felons, for their part, in certain circumstances may feel they have little to lose in committing criminal acts, particularly if they are serving lengthy sentences. Paroled felons by their previous conduct have shown that the law's deterrent effect was insufficient to dissuade them from engaging in criminal acts. The added measure of deterrence presented through capital punishment, therefore, is appropriately applicable to both classes of felons.[16]

C. Party to an Agreement

The defendant argues that the trial court improperly allowed the jury to consider as an aggravator that "[t]he defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed." § 16-11-103(6)(e), 8A C.R.S. (1986). The defendant argued to the trial court that this aggravator was intended by the legislature to apply only to "contract-kill circumstances." Further, the defendant argues that the broad interpretation of this aggravator adopted by the trial court is forbidden by the Eighth Amendment to the United States Constitution and Article II, Section 20 of the Colorado Constitution. We reject the defendant's arguments.

As with the statutory aggravator "under sentence of imprisonment," the defendant points to the legislative history of this aggravator, which he argues requires this court to construe narrowly the term "party to an agreement" to include only contract murders and murders for hire. Defendant contends that a sponsor of the bill, Senator Plock, stated before the Senate Judiciary Committee regarding this aggravator that:

> [The] third category [of aggravating factors is] after deliberation, if a person is a party to an agreement in furtherance of which a person is then intentionally killed. That is your contract killing.

*Defendant's Brief* at p. 48, *quoting Audiotape of Hearings before Senate Judiciary Committee on Senate Bill 46,* Forty-Ninth General Assembly, Second Session, January 24, 1974, 1:38 p.m.

The defendant also points to the statements of Representative Strahle, a sponsor of the death penalty bill, who explained the aggravator as follows:

> He has been a party to an agreement in further—in furtherance of which a person's been intentionally killed. The reason that is in there is that it seemed to me this perhaps was the—was the one kind of murder in which there is a likelihood of—of deterrence, if there is any, as a result of passage of the death penalty. I think the whole question of whether or not the death penalty is a deterrent is an unproven and substantially unprovable question. Last year, when this bill was in the Judiciary Committee, we got in a passioned [sic] argument on both sides. But when it comes right down to it the question of deterrence and the question of statistics on a valid basis are questions that are so difficult that I don't believe I've been convinced or been offered convincing evidence by anyone. I think you make a judgment and you hope you're right and—but, but if there is any deterrent factor in the death penalty, surely it must come—or in nature of a situation where a person—some people put out a contract to kill somebody. An agreement, or a murder for profit, in other words.

16. Our holding today that the language "under a sentence of imprisonment" includes the period of parole is in accord with the decisions of a number of courts which have construed similar provisions in other states. *See Peek v. State,* 395 So.2d 492 (Fla.1980), *cert. denied,* 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981); *Straight v. State,* 397 So.2d 903 (Fla.), *cert. denied,* 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981). *See also Gray v. Lucas,* 677 F.2d 1086 (5th Cir. 1982), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1886, 76 L.Ed.2d 815 (1983) (court holds that Mississippi's construction of the term "under a sentence of imprisonment" to include parolees not unconstitutionally vague).

*Defendant's Brief* at p. 49, *quoting* testimony of Rep. Strahle on House Bill 1095, *Audiotape of Hearing before House State Affairs Committee,* Forty-Ninth General Assembly, Second Session, January 31, 1974, 3:40 p.m.

However, as with the statutory aggravator "while under sentence of imprisonment," the comments of the sponsor here are not conclusive. No one disputes that this aggravator includes contract murders. The question is whether it also includes murders such as the one in this case which, although not for profit, was carefully planned in advance by two persons as part of a scheme to kidnap and rape a woman in order to improve the sex life of the perpetrators. *See* testimony of Gary Davis. (v. 15, pp. 66–69) The sponsors' testimony cited by the defendant is unhelpful on this question.

As noted above, in interpreting a statute we must attempt to ascertain the intent of the General Assembly. *Kern v. Gebhardt,* 746 P.2d 1340. To determine such intent we first look to the language of the statute. *Id.* When the meaning of a statute is clear, it is unnecessary to examine its legislative history. *People v. Armstrong,* 720 P.2d 165 (Colo.1986). The evidence here fully supports the jury finding that the defendant was a party to an agreement with his wife that the couple would kill Virginia May and that she was in fact killed. Thus, under the *plain language* of the statute, this aggravator was proved in this case. We note further that had the legislature desired that this aggravator be limited to a contract killing situation or to murders for pecuniary gain, it could have chosen to use such narrow language.[17] As the numerous statutes cited by the defendant demonstrate, the legislature had such narrowly drawn statutes available as models had it wished to follow the lead of those states.[18]

Further, we are persuaded by the People's argument that the legislative policy in adopting the aggravator also supports applying this aggravator in the present case. Conspiracy to commit a crime has been recognized as an "evil in itself." *Ianelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Likewise, a conspiracy to commit murder might be viewed by the legislature as a more blameworthy method of committing murder and thus more deserving of the ultimate punishment. The legislature might have concluded that the involvement of two or more persons in a plan to take the life of another multiplies the evil in that the depravity of mind requisite to take innocent human life is present not in one person, but in two or more.[19] We hold that the trial court properly concluded that section 16–11–103(6)(e)

17. Further, we observe that the legislature in section 16–11–103(6)(h) established as a separate aggravator that "[t]he class 1 felony was committed for pecuniary gain."

18. For example, see the following state provisions: Alabama, ALA.CODE § 13A–5–40(a)(7) (Repl.1982 & Supp.1989) ("[m]urder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire"); DEL.CODE ANN. tit. 11, § 4209(e)(1)(h) (1987) ([t]he defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim); Georgia, GA.CODE ANN. § 17–10–30(b)(4), (b)(6) (1982) ("[t]he offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value" and "[t]he offender caused or directed another to commit murder or committed murder as an agent or employee of another person").

19. As Justice Frankfurter wrote in *Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961):

> [C]ollective criminal agreement—partnership in crime—presents a greater potential threat to the public than other individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.

extends to situations such as that present in this case. We now address the defendant's objection that even if the statute were meant to cover such circumstances, the constitution precludes such a construction.

The defendant offers two United States Supreme Court cases, *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), for the proposition that consonant with the Eighth and Fourteenth Amendments to the United States Constitution "a reviewing court should look at the legislative judgments of other states to determine whether death as a punishment is valid under a particularized set of facts." *Defendant's Brief,* at p. 50. The defendant asserts that thirty-seven states presently authorize the imposition of capital punishment and that none allows the imposition of the death penalty based on the aggravating factor that the defendant was a party to a "mere" agreement. Other states require, according to the defendant, at the minimum a contract murder, murder for hire, a solicitation for murder, or murder for pecuniary gain.

Although the experience and practice of other states is relevant in devising a capital punishment scheme which appropriately addresses the desires of the electorate while respecting the constitutional rights of the defendant, the factors which other states thought relevant to the decision of whether a particular murder is deserving of capital punishment are not dispositive on the question of the constitutionality of a particular aggravator adopted by our legislature. We note that the cases cited by the defendant, *Enmund* and *Coker,* concern the issue of whether particular crimes could be punished by death. In *Coker,* the Supreme Court concluded that imposing the death penalty for the crime of rape was grossly disproportionate and excessive punishment and was proscribed by the Eighth Amendment as cruel and unusual punishment. *Coker,* 433 U.S. at 592, 97 S.Ct. at 2866. In *Enmund,* the Court considered whether "death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." *Enmund,* 458 U.S. at 787, 102 S.Ct. at 3371. In answering this question, the Court "looked to the historical development of the punishment at issue, legislative judgments, international opinion, and the sentencing decisions juries have made before bringing its own judgment to bear on the matter." *Enmund,* 458 U.S. at 788–89, 102 S.Ct. at 3372.[20]

In this case, however, the defendant cannot claim that he "neither took life, attempted to take life, nor intended to take life," *i.e., Enmund.* Ultimately, the jury sentenced the defendant to death not because the defendant was a party to an agreement to kill, but rather because he, in cold blood, brutally murdered Virginia May. Thus the cases cited by the defendant are inapposite.

The Supreme Court has offered little guidance on the proper standards for examining the validity of a particular statutory aggravator beyond recognizing that an aggravator may be so vague as to violate a defendant's right to due process of law, such as the cruel and heinous aggravator in *Cartwright.* However, the Tenth Circuit Court of Appeals in the *Cartwright* case engaged in a useful analysis of the standards for evaluating the constitutionality of a particular aggravator:

> An aggravating circumstance is a standard established by the legislature to guide the sentencer in choosing between life imprisonment and the death penalty. In essence, an aggravating circumstance is a legislative determination that "this murder is different." This difference "must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant,* 462 U.S. at 877, 103

20. *But see Tison v. Arizona,* 481 U.S. 137, 150, 107 S.Ct. 1676, 1684, 95 L.Ed.2d 127 (1987) (Court upholds death sentence of two brothers who participated in their father's armed prison breakout and a subsequent kidnapping and murder, even though neither defendant "took any act which he desired to, or was certain would cause death.").

S.Ct. at 2742 (footnote omitted). A statutorily designated aggravating circumstance accomplishes this by "identify[ing] special indicia of blameworthiness or dangerousness in the killing." Weisberg, *Deregulating Death,* 1983 Sup.Ct.Rev. 305, 329 (1983). Thus, "the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg,* 428 U.S. at 192, 96 S.Ct. at 2934 (opinion of Stewart, Powell, and Stevens, JJ.).

The narrowing function of an aggravating circumstance demands that such a factor be capable of objective determination. Thus, aggravating circumstances must be described in terms that are commonly understood, interpreted and applied. To truly provide guidance to a sentencer who must distinguish between murders, an aggravating circumstance must direct the sentencer's attention to a particular aspect of a killing that justifies the death penalty.

*Cartwright,* 822 F.2d at 1485.

In the absence of problems of vagueness, such as in *Cartwright,* or in the absence of the imposition of a death sentence on persons who themselves do not attempt to take life or intend to take life, such as in *Enmund,* the Supreme Court has been reluctant to consider whether a particular aggravator chosen by a state is appropriate. In *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Court stated:

In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty. In *Gregg v. Georgia,* 428 U.S. 153 [96 S.Ct. 2909, 49 L.Ed.2d 859] (1976), and its companion cases, the Court reviewed the capital sentencing schemes of five States to determine whether those schemes had cured the constitutional defects identified in *Furman v. Georgia,* 408 U.S. 238 [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972). In *Gregg* itself, the joint opinion of JUSTICES STEWART, POWELL, and STEPHENS concluded that the Georgia sentencing scheme met the concerns of *Furman* by providing a bifurcated proceeding, instruction on the factors to be considered, and meaningful appellate review of each death sentence. 428 U.S., at 189–195 [96 S.Ct., at 2932–36]. Satisfied that these procedural safeguards "suitably directed and limited" the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action," *id.,* at 189 [96 S.Ct. at 2932], the joint opinion did not undertake to dictate to the State the particular *substantive* factors that should be deemed relevant to the capital sentencing decision. Indeed, the joint opinion observed: "It seems clear that the problem [of channeling jury discretion] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant *that the State, representing organized society, deems particularly relevant to the sentencing decision.*" *Id.,* at 192, 96 S.Ct. at 2934.

*Ramos,* 463 U.S. at 999–1000, 103 S.Ct. at 3452 (emphasis supplied by the Court).

The Court in *Ramos* recognized that it had limited the state choice of criteria if such criteria were excessively vague, and further, that death sentencing schemes must allow consideration of the individual characteristics of the offender and his crime. *Ramos,* 463 U.S. at 1000–01, 103 S.Ct. at 3452–53. Finally, the Court noted that in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Court had held that a death sentence may not be imposed on the basis of a presentence investigation report containing information that the defendant has had no opportunity to explain or deny. However, the Court stated, "[b]eyond these limitations, as noted above, the Court has deferred to the State's choice of substantive factors relevant to the penalty determination." *Ramos,* 463 U.S. at 1001, 103 S.Ct. at 3453.

The function of aggravators also was discussed by the Supreme Court in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), where the Court noted:

> [O]ur decisions since *Furman* have identified a constitutionally permissible range of discretion in imposing the death penalty. First, there is a required threshold below which the death penalty cannot be imposed. *In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold.*

*McCleskey,* 481 U.S. at 305, 107 S.Ct. at 1774 (emphasis added).

Thus, in determining the constitutionality of this aggravator, as we have interpreted it, we must consider whether the aggravator establishes "rational criteria" for narrowing the jury's discretion in considering whether death is appropriate, *McCleskey,* and whether the aggravator identifies special indicia of blameworthiness or dangerousness capable of objective determination, *Cartwright.* This aggravator, as we interpret it, is sufficiently precise to permit objective consideration by the jury. The language of the aggravator, that "[t]he defendant has been a party to an agreement to kill another person in furtherance of which a person has been intentionally killed," is clear and lends itself to ready application by reasonable jurors. Further, for the reasons stated in our discussion of the intent of the legislature in adopting this aggravator, we conclude that it is based upon rational criteria for guiding the jury in its exercise of discretion.

D. Kidnapping

The defendant also argues that the trial court improperly allowed the jury to consider as an aggravator the provision of section 16–11–103(6)(d) that "[t]he defendant intentionally killed a person kidnapped or being held as a hostage by him or anyone associated with him." The defendant argues that this aggravator only applies to "a kidnap for ransom situation" and not to "simple" or second degree kidnapping. We reject the defendant's contention.

Again, in interpreting this statute, we must ascertain the intent of the legislature by reference to the plain language of the statute. The statute here states that the aggravator applies if the defendant kills "a person kidnapped," without more. The defendant does not dispute that the jury found him guilty of second-degree kidnapping. We conclude, therefore, that pursuant to the plain language of the statute, the legislature intended to include both degrees of kidnapping in this aggravator.

As with the "party to an agreement" aggravator, the defendant also urges that the narrowing construction he advocates is compelled by the state and federal constitutions. For reasons similar to our rejection of defendant's argument respecting the "party to an agreement" aggravator, we are not persuaded that the defendant's proffered construction is constitutionally compelled. The aggravator, as interpreted by the trial court, "genuinely narrow[s] the class of persons eligible for the death penalty." *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. Further, we find that the aggravator establishes "rational criteria," for conducting this narrowing process. *See McCleskey,* 481 U.S. at 305, 107 S.Ct. at 1774. The legislature might well have determined that an abduction followed by a murder is particularly deserving of consideration for the death penalty. The legislature reasonably could view as particularly cruel the suffering to which a kidnapping victim is subjected, through the criminal's calculated terror, as the victim is forced to accompany him, possibly to the victim's own execution. Such circumstances were present in this case and properly may form the basis for including this murder among those particularly deserving of capital punishment.

The defendant also challenges the submission of the kidnapping aggravator for another reason. He argues that under our decision in *People v. Powell,* 716 P.2d 1096 (Colo.1986), the trial court defined "kidnapping" in an unconstitutionally

vague manner. During the guilt phase, the court gave the following instruction to the jury:

The elements of the crime of kidnapping in the second degree are:

1. that the defendant,
2. in the state of Colorado, at or about the date and place charged,
3. knowingly,
4. forcibly, or otherwise, seized and carried any person from one place to another,
5. without her consent,
6. without lawful justification,
7. by use of a rifle[.] [21]

Contrary to the defendant's contention, *Powell* does not require reversal on the basis that this instruction was improper. In *Powell,* we held that section 18-3-302, 8 C.R.S. (1985 Supp.), defining kidnapping was unconstitutionally vague. That section provided that "[a]ny person who knowingly, forcibly, or otherwise seizes and carries any person from one place to another" was guilty of kidnapping. We noted that the statute failed to indicate that the mental state of "knowingly" is a separate element of the offense. *Powell,* 716 P.2d at 1101. Nevertheless, we excised the words "forcibly or otherwise" from the statute and held that the remainder of the statute was severable from the excised portion, and as excised, was constitutional. We then upheld the defendant's conviction for second-degree kidnapping on the basis that the instruction actually given to the jury, unlike the statute as written, did not unconstitutionally allow the jury to find the defendant guilty without a finding of the culpable mental state. *Powell,* 716 P.2d at 1102. The instruction given in this case is indistinguishable from the one given in *Powell* and thus properly informed the jury of the law. We reject the defendant's contention.

E. Avoiding or Preventing Lawful Arrest

The defendant also objects that the trial court improperly allowed the jury to consider as an aggravator the provision of section 16-11-103(6)(k) which, in relevant part, states: "The class 1 felony was committed for the purpose of avoiding or preventing a lawful arrest or prosecution or effecting an escape from custody. This factor shall include the intentional killing of a witness to a criminal offense." The defendant argued to the trial court that this aggravator only applies to situations where: (1) during the investigation or prosecution of a separate offense which had previously taken place, a witness was killed in an attempt to thwart the investigation or prosecution; or (2) a law enforcement officer was killed while attempting to effect an arrest. We disagree.

The People argue that this aggravator is appropriate if the evidence indicates that a defendant has murdered the victim of a contemporaneously or recently perpetrated offense and the reason for the murder was to prevent the victim from becoming a witness.[22] By putting the focus on the purpose of the murder, this aggravating factor cannot be said to include all murder victims because they are all potential witnesses. We agree with the People's position.

Once again, we look to the plain language of the statute and conclude that the instruction in this case, which closely tracked the language of the statute, was properly submitted to the jury. Further, the defendant conceded in his own testimony that the reason he killed May was so that she could not be a witness against him. (v. 15, p. 73) Thus the evidence supports the jury's finding that the prosecution had proved the existence of this aggravator beyond a reasonable doubt. While we agree with the defendant that it covers

21. The defendant does not argue that the allegedly improper instruction requires reversal of the guilty verdict on the kidnapping charge.

22. Of course the antecedent crime must be one which is not inherent or necessarily incident to murder such as assault or battery, otherwise every murder could be punished by death. *See Zant,* 462 U.S. at 877, 103 S.Ct. at 2742 (an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder).

the situations he describes, we see no basis for limiting the aggravator to those situations, and we reject defendant's challenge.[23]

F. Felony Murder

The defendant also argues that the trial court improperly allowed the jury to consider the aggravator defined by section 16–11–103(6)(g) which states:

> The defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants; ....

The defendant does not challenge the constitutionality of this aggravator, nor its applicability in this particular case. The defendant argues, however, that because the "felony" underlying this aggravator, kidnapping, formed the basis for the aggravator defined by section 16–11–103(6)(d), the court impermissibly allowed a "doubling up" of the two aggravators. The "doubling up" is improper, the defendant argues, because it allowed the prosecutor to characterize a single factual circumstance, the kidnapping and murder of May, as constituting two aggravators and thereby "artificially inflated" the aggravating factors and that this created a substantial risk that the death penalty would be imposed in an arbitrary and capricious manner, contrary to the command of *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976).

We first observe that the defendant did not object to the presentation to the jury of the "felony murder" aggravator. Nor did he present a "doubling up" argument to the court during the presentation of the "kidnapping" aggravator. Thus, our review here is limited to plain error. We will reverse a conviction in such cases only if the error so undermined the fundamental fairness of the proceeding so as to cast serious doubt on the reliability of the verdict. *Wilson v. People,* 743 P.2d 415, 420 (Colo.1987).[24]

The defendant points to a number of state court decisions which, under various circumstances, have held that such overlapping of aggravators is impermissible. *See Provence v. State,* 337 So.2d 783 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977) (court holds that prosecution could not offer as aggravators both that the murder occurred in the commission of a robbery and that it was committed for pecuniary gain); *Randolph v. State,* 463 So.2d 186, 193 (Fla. 1984) (same); *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979) (court holds that trial court erred in submitting to jury both the aggravator that the capital felony was committed to "disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws," and the aggravator that it was committed "for the purpose of avoiding or preventing a lawful arrest").

However, in reviewing these cases, as well as others cited by the defendant, we have found no basis for concluding that the decisions of these courts were based upon

23. In rejecting the defendant's argument, we recognize that a number of state courts have come to a different conclusion. *See People v. Silva,* 45 Cal.3d 604, 247 Cal.Rptr. 573, 754 P.2d 1070 (1988); *cert. denied,* — U.S. —, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989); *State v. Loyd,* 459 So.2d 498, 504 (La.1984), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). However, other courts are in accord with our decision here today. *See Evans v. Thigpen,* 631 F.Supp. 274 (S.D.Miss.1986), *aff'd* 809 F.2d 239 (5th Cir.1987), *cert. denied,* 483 U.S. 1033, 107 S.Ct. 3278, 97 L.Ed.2d 782 (1987); *Pickens v. State,* 261 Ark. 756, 551 S.W.2d 212 (1977), *cert. denied,* 435 U.S. 909, 98 S.Ct. 1459, 55 L.Ed.2d 500 (1978); *Leatherwood v. State,* 435 So.2d 645 (Miss.1983), *cert. denied,* 465 U.S. 1084, 104 S.Ct. 1455, 79 L.Ed.2d 772 (1984); *State v. Griffin,* 756 S.W.2d 475 (Mo.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989); *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, *cert. denied,* 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977).

24. Thus we reject the defendant's contention that in capital cases "plain error review is inapplicable." However, as noted by the defendant, we have held that if the asserted error is of constitutional dimension, reversal is required unless the court concludes that the error was harmless beyond a reasonable doubt. *Graham v. People,* 705 P.2d 505, 509 (Colo.1985). In this instance, we conclude that the error, if any, was not constitutional error.

the federal constitution. Of course, we are not bound by the decisions of the courts of other states interpreting their particular statutes. Also, the defendant has not pointed to, and we have not found, any federal cases which support the recognition of a federal constitutional basis for invalidating the use of aggravators which are otherwise individually proper but in a particular case may overlap in part or in whole. In fact, *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, discussed above at 177–178, suggests overlapping aggravators do not raise a constitutional objection.

Under our statutory scheme, the jury must find the existence beyond a reasonable doubt of one aggravator in order to proceed to the weighing of aggravators and mitigators. The jury here was carefully and properly instructed in Instruction No. 2 that "it is the weight assigned to each factor, and not the number of factors found to exist that is to be considered." Thus, the doubling up of aggravators is not legally significant under the Colorado death penalty procedure. Because, by the plain language of our statute, both aggravators applied under the facts of this case, we find no error in their submission to the jury. *See People v. Melton,* 44 Cal.3d 713, 764–65, 244 Cal.Rptr. 867, 897–98, 750 P.2d 741, 771–72, *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988) (court found no error in submission as an aggravator "the presence ... of criminal activities by the defendant which involved the attempted use of force or violence" and the aggravator "the presence ... of any prior felony convictions"); *State v. Clark,* 108 N.M. 288, 306, 772 P.2d 322, 339, *cert. denied,* — U.S. —, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989) (court rejects "doubling up" argument for aggravators "murder of a witness" and "murder in the course of kidnapping").

## IV.

### *Jury Instructions*

#### A. Standard of Review

The defendant also objects to a number of instructions given to the jury during the sentencing phase of the bifurcated trial. Before we address defendant's specific objections, it is necessary to consider the appropriate standards of review. First, as noted above, we reject defendant's suggestion that harmless error analysis is inapplicable in capital cases. The difficulty with trying a capital case against the ever-changing legal landscape is self-evident. Unless trial errors are held to require reversal only if they prejudice the defendant, it will be nearly impossible to proceed with trials in capital cases.

Further, when a defendant has failed to object to an alleged error, this court will consider the error only under the plain error standard. *Vigil v. People,* 196 Colo. 522, 587 P.2d 1196 (1978); Crim.P. 52(b). Under this standard, errors not raised at trial will require reversal only where they so undermine the fundamental fairness of the proceeding as to cast doubt on the reliability of the verdict. *Wilson v. People,* 743 P.2d 415 (Colo.1987).[25] Reliability in this context means the certainty that, despite the error, the jury would have found beyond a reasonable doubt that death was the appropriate penalty. A different standard applies when the unpreserved error is of constitutional dimension. Under those circumstances, reversal is required unless this court is convinced that the error was harmless beyond a reasonable doubt. *People v. Rodgers,* 756 P.2d 980, 984 (Colo.1988).

Additional principles apply when reviewing the propriety of jury instructions in the sentencing phase. In conducting such a review, we are guided by the Supreme Court's decisions in *Boyde v. California,* — U.S. —, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) and *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). In *Boyde,* a case in which the defendant challenged certain instructions given during the sentencing phase of his capital trial, the Court reviewed the various standards it had em-

25. Also, Crim.P. 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

ployed in prior cases in determining whether challenged jury instructions "restrict impermissibly a jury's consideration of relevant evidence...." *Boyde,* 110 S.Ct. at 1197. The Court thought it important to settle upon a single formulation for considering this issue and held that "the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* 110 S.Ct. at 1198.

To determine whether such a reasonable likelihood exists, we must focus initially on the specific language challenged. *Brown,* 479 U.S. at 542, 107 S.Ct. at 840. If the specific instruction fails constitutional muster, we then review the instructions as a whole to determine whether the entire charge delivered a correct interpretation of the law. *Id.* With these principles in mind, we consider the instructions which the defendant challenges in this case.

B. Weighing of Aggravating and Mitigating Circumstances

The defendant argues that the trial court erred by instructing the jury in accordance with the language of section 16-11-103(2)(a)(II) that it could consider death as a penalty for the defendant only if it found that "[n]o mitigating factor or factors outweigh the aggravating factor or factors found to exist beyond a reasonable doubt." Defendant acknowledges that the instruction closely tracks the relevant statutory language, but nonetheless concludes that the instruction is unconstitutional because it does not require a finding of an "aggravating factor or factors which outweigh mitigating factors." The defendant asserts the statute impermissibly authorizes a death sentence when the aggravating and mitigating circumstances are of equal weight.

However, this court considered and rejected the argument now raised by the defendant in *People v. Tenneson,* 788 P.2d 786 (Colo.1990). *Tenneson* is dispositive, and we need not review here the basis of our holding in that case.

C. Allocution as Evidence

The defendant objects to certain portions of Instruction No. 1, given at the conclusion of the penalty phase of the trial. Specifically, he argues that the highlighted portions of that instruction were improper. Instruction No. 1 stated:

INSTRUCTION NO. 1

Members of the jury, the evidence in this penalty phase hearing has been completed. In a moment I will read you the law which you must apply in order to reach your sentencing decision. But first, I want to mention a few things that you need to keep in mind when you are discussing this case in the jury room.

It is my job to decide what rules of the law apply to the case. While the lawyers may have commented during the penalty phase hearing on some of these rules, you are to be guided by what I say about them. You must follow all of the rules as I explain them to you. Even if you disagree or don't understand the reasons for some of the rules, you must follow them. No single rule describes all the law which must be applied. Therefore, the rules must be considered together as a whole.

During the course of the trial and penalty phase hearing you received all of the *evidence* that you may properly consider to decide the case. Your decision must be made by applying the rules of law which I give you to the *evidence* presented.

It is your duty to determine the facts from the *evidence* you have heard during the entire trial including any additional *evidence* presented during the penalty phase hearing. Then you are to evaluate those facts in light of the requirements set forth in these instructions.

At times during the penalty phase hearing lawyers made objections to questions asked by other lawyers, and to answers by witnesses. Do not draw any conclusions from such objections or from my rulings on the objections. These only related to the legal questions that I had

to determine and should not influence your thinking. *When I told you not to consider a particular statement, you were told to put that statement out of your mind, and you may not consider any statement in your deliberations which you were instructed to disregard. The unsworn statement of the defendant is not evidence.*

*Finally, you should consider all the evidence in the light of your observations and experience in life.*

(Emphasis added.)

Further, the defendant objects to that part of Instruction No. 4 telling the jury that:

> There is no burden of proof as to proving or disproving mitigating factors and you should consider all of the evidence presented at the trial and the sentencing hearing as it relates to mitigating factors.[26]

By informing the jury that "the unsworn statement of the defendant is not evidence" and by several times emphasizing to the jury that it should consider only "evidence" in determining whether to sentence the defendant to death, the defendant claims that the court denied him his constitutional right to have the sentencing body consider all possible mitigating circumstances and to an individualized sentencing determination. *Defendant's Brief,* at 88, *citing Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Further, the defendant urges that the trial court improperly denigrated his right of allocution. Because the defendant did not offer these objections at trial, we consider them under plain error analysis.

As conceded by the People, Crim.P. 32(b) and the precedents of this court clearly establish that a defendant has the right before sentencing to make a statement on his own behalf and to present any information in mitigation of punishment.[27] In *Borrego v. People,* 774 P.2d 854, 856 (Colo. 1989), we rejected the prosecutor's argument that allocution should not be permitted in capital cases. We held that "a defendant's right to allocution is even more pronounced when facing the possibility of a death sentence...." *Id.* Thus, the defendant is correct in pointing to the impor-

**26.** Instruction No. 4 stated in whole:

> The second step of your deliberations is to determine if any mitigating factor or factors exist.
>
> Mitigation is any abatement or diminution of a penalty or punishment imposed by law. Mitigating factors are circumstances which do not constitute a justification or excuse for the offense in question, but which, in fairness, may be considered as extenuating or reducing the degree of moral culpability or which in any other way, alone or together with other such circumstances, may allow a sentence of life imprisonment instead of the death penalty.
>
> There is no burden of proof as to proving or disproving mitigating factors and you should consider all of the evidence presented at the trial and the sentencing hearing as it relates to mitigating factors.
>
> Mitigating factors are:
>
> 1. The age of the defendant at the time of the crime.
> 2. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.
> 3. The defendant was under unusual and substantial duress although not such duress as to constitute a defense to prosecution.
> 4. The defendant was a principal in the offense which was committed by another, but the defendant's participation was relatively minor, although not so minor as to constitute a defense to prosecution.
> 5. The emotional state of the defendant at the time the crime was committed.
> 6. The extent of the defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting District Attorney.
> 7. The influence of drugs or alcohol.
> 8. The defendant is not a continuing threat to society.
> 9. Any other circumstance which bears on the question of mitigation.

**27.** Also, section 16-11-102(5), 8A C.R.S. (1986), provides:

> After receiving the presentence report and before imposing sentence, the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment. The prosecution also shall be given an opportunity to be heard on any matter material to the imposition of sentence. The court shall then sentence the defendant pursuant to the provisions of this article and section 18-1-105, C.R.S.

tance we have attached to a defendant's right to allocute in a capital case. The defendant argues that because the jury was told that the defendant's statement was not evidence and that it must only consider evidence in determining the appropriate sentence, it improperly was precluded from giving full consideration to the defendant's statement. The defendant argues that under the Supreme Court's holding in *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), a juror may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis in original), and that therefore reversal is required here. However, we disagree with the defendant's contention that the trial court's instructions precluded the jury from properly considering his allocution.

The trial court was technically correct in instructing the jury that allocution is not evidence.[28] The right to allocute is no more than the defendant's "right to stand before the jury and ask in his own voice that he be spared." *State v. Zola,* 112 N.J. 384, 409, 548 A.2d 1022, 1045 (1988).[29] Allocution is not a fact to be proved or disproved. However, in the sentencing phase of a capital case, the jury is not limited to consideration of matters technically defined as evidence. In making the profoundly moral decision of whether to impose a sentence of death, it must consider all the facts and circumstances of the crime, the defendant's background and character and any mitigating factors raised by the defendant. Plainly, the jury's deliberations are not limited to assessing technical evidence.

The question before us is whether the jurors might have interpreted the instructions as forbidding them from considering the defendant's statement offered in allocution. As discussed above, the Supreme Court's opinion in *Boyde* is instructive. The defendant in *Boyde* argued that an instruction to the jury that it could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," did not sufficiently allow the jury to consider "non-crime-related factors, such as his background and character, which might provide a basis for a sentence less than death." *Boyde,* 110 S.Ct. at 1197. In rejecting the defendant's claim, the Court held that "there is not a reasonable likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character." *Boyde,* 110 S.Ct. at 1198.

In reviewing the challenged instructions in this case, we first focus on the specific language challenged. *California v. Brown,* 479 U.S. at 541, 107 S.Ct. at 839. We then may review the charge as a whole, with an eye toward the context in which it was given. *See Boyde,* 110 S.Ct. at 1199 (Court found it unlikely that a reasonable juror would fail to consider the evidence offered by the defendant in mitigation, though not related to the circumstances of the crime, in light of the extensive presentation of testimony during the sentencing hearing relating to the defendant's background and character).

First, although Instruction No. 4 told the jury that it should only consider all of the "evidence" presented at the trial and the sentencing hearing as it related to mitigating factors, the other instructions made it clear that the jury could consider any aspect of the trial or sentencing hearing a particular juror considered relevant. Instruction No. 7 told the jury that:

> Before imposing a death sentence, you must unanimously be convinced that death is the appropriate penalty for the individual defendant being considered. This consideration involves a process in which you must apply your reasoned judgment in deciding whether the situa-

28. CJI–Crim. 1:03 states that "[e]vidence consists of the sworn testimony of the witnesses, the exhibits received in evidence, and stipulated, admitted, or judicially noticed facts."

29. The defendant's allocution here consisted of a short statement in which he acknowledged his guilt and asked the jury that it sentence him to life imprisonment.

tion calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of the circumstances present. If you are not all convinced that death is the appropriate penalty, the sentence must be life imprisonment.

Regardless of the findings you have made in steps one, two and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.

Also, on closing argument defendant's counsel asked the jury for mercy, noting that "each one of you has it in your hand to spare Gary Davis." (v. 2A, p. 56) If counsel could ask the jury for mercy under these circumstances, a reasonable juror hearing these instructions must have concluded that the purpose of offering the defendant's statement in allocution was for the jury to consider in passing sentence. *Compare Boyde,* 110 S.Ct. at 1195 (court notes comment of California Supreme Court, below, in *People v. Boyde,* 46 Cal.3d 212, 251, 250 Cal.Rptr. 83, 105, 758 P.2d 25, 47 (1988), that it was "inconceivable [that] the jury would have believed that, though it was permitted to hear defendant's background and character evidence and his attorney's lengthy argument concerning that evidence, it could not consider that evidence."). Thus, our examination of the instructions as a whole, as well as the context of the sentencing hearing, leads us to conclude that there is not a "reasonable likelihood" that the jury applied instructions No. 1 and No. 4 in a manner preventing it from considering constitutionally relevant evidence.[30] On the contrary, reasonable jurors would have properly understood that they should consider fully the statement offered by the defendant in allocution. We reject the defendant's contentions.

D. Sympathy Instruction

The defendant objects to the following instruction given at the conclusion of the guilt phase of the trial:

> During the course of the trial you received all the evidence that you may properly consider to decide the case. Your decision must be made by applying the rules of law which I give you to the evidence presented at trial. Neither sympathy nor prejudice should influence your decision.

(v. 2, p. 347) The defendant argues that this instruction may have misled the jury to believe that it could not consider "mercy" in determining whether the defendant should be sentenced to death. The defendant did not object to the instruction when it was given and did not seek a clarifying instruction during the penalty phase. Thus we review the asserted error under the plain error doctrine.

The defendant cites a number of cases in support of the notion that the instruction "improperly undermined the jury's ability to consider fully the defendant's mitigating evidence." *Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988), *rev'd sub nom., Saffle v. Parks,* — U.S. —, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990); *see also Legare v. State,* 250 Ga. 875, 302 S.E.2d 351 (1983) (anti-sympathy penalty phase instruction may confuse jury as to its option to recommend mercy). However, these cases do not support the defendant's position.[31] The in-

30. The Supreme Court in *Boyde* used the term "evidence" in a non-technical sense to include all material and circumstances relevant to the jury's sentencing decision.

31. The Supreme Court in *Saffle v. Parks,* — U.S. —, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), reversed the Tenth Circuit Court of Appeals' decision in *Parks v. Brown,* 860 F.2d 1545 (10th Cir.1988), a case heavily relied upon by the defendant in his challenge to the anti-sympathy instruction in this case. The Supreme Court rejected a challenge to an instruction given in the sentencing phase which told the jury that it "must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence." *Parks,* 110 S.Ct. at 1259. The Supreme Court upheld the use of the instruction stating: "It is no doubt constitutionally permissible, if not constitutionally required, [citation omitted] for the State to insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" 110 S.Ct. at 1262, *quoting California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., con-

struction given here, taken word for word from CJI–Crim. 3:01, was given in the guilt phase, not in the sentencing phase, and properly instructed the jury on the law. We find that there is not a reasonable likelihood that the jury would have applied this instruction in a way precluding it from considering the defendant's plea for mercy. The defendant's contention is without merit.

E. Proving Mitigating Factors

Defendant also objects to the following portion of Instruction No. 5 given during the sentencing phase of the trial:

> If in the first two steps of your deliberations you have made unanimous findings that the prosecution has proven beyond a reasonable doubt that one or more aggravating factors exist and that no mitigating factors exist, or that a mitigating factor or factors exist, you must now decide whether the prosecution has proven that any factors in aggravation outweigh any factors in mitigation.

The defendant alternately argues that the instruction either (1) permitted the jury to consider a particular mitigating factor only if it unanimously found the existence of such mitigator; [32] or (2) that the instruction imposed on the prosecution the burden of establishing the existence of mitigators beyond a reasonable doubt. We reject the defendant's interpretation of this instruction.

When Instruction No. 5 is considered as a whole, we find that there is not a reasonable likelihood that the jurors interpreted the instruction in the manner suggested by the defendant. Instruction No. 5 informs the jury that it "must weigh the aggravating factor or factors found to exist against any and all mitigating factors." The jurors were not told they could only consider the mitigating factors which "they found to exist." This is significant because the jurors were instructed that they could only proceed to the weighing process if they unanimously found, beyond a reasonable doubt, that a statutory aggravator existed. The instruction further informed the jury that:

> If all, or one or more of the jurors believe that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury shall enter a verdict of life imprisonment.

We believe that a reasonable juror would interpret this portion of Instruction No. 5 as indicating that if any one juror thought that any single factor in mitigation outweighed the aggravating factors, the jury must return a verdict of life imprisonment.

Our conclusion that Instruction No. 5 did not mislead the jury is supported by the instructions taken as a whole. First, the general charge to the jury states that "[n]o single rule describes all the law which must be applied. Therefore, the rules must be considered together as a whole." Instruction No. 2 tells the jury that it may consider only those aggravators found to exist beyond a reasonable doubt. It tells the jurors that "[y]ou may assign any weight you wish to each aggravating or mitigating factor." It also states that "[i]f one or more jurors finds sufficient mitigating factor or factors exist that outweigh a specified aggravating factor or factors, then the result is a sentence of life imprisonment." This instruction does not tell the jury that a single juror could find that a mitigator outweighed an aggravator only if the jury had previously determined unanimously that the mitigator existed. Such an interpretation would be absurd, particularly when considered with the fact that some of the mitigators offered by the

curring). Thus, it is unlikely that the defendant could support a claim of error even if the instruction in question were given during the penalty phase of the trial.

32. In *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court reversed a sentence of death on the basis that the jury instructions in that case created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills,* 486 U.S. at 384, 108 S.Ct. at 1870. Because we find that the instructions in this case did not require unanimity for the consideration of mitigating evidence, *Mills* is inapplicable.

defendant were of a subjective nature and were intangible to the extent it would be difficult to make a finding as to their existence or nonexistence.[33] Instruction No. 4 tells the jury that "[t]here is no burden of proof as to proving or disproving mitigating factors and you should consider all of the evidence presented at the trial and the sentencing hearing as it relates to mitigating factors." Instruction No. 6 tells the jurors that "[e]ach of you must also decide for yourself what weight to give each mitigating circumstance that you find exists." Finally, Instruction No. 7 makes it clear to a juror that even if he or she had not considered a mitigating factor previously because of the lack of unanimity in the previous deliberations or for any other reason, the juror could do so in the final consideration of whether death was the appropriate penalty. Instruction No. 7 stated in relevant part:

> Before imposing a death sentence, you must unanimously be convinced that death is the appropriate penalty for the individual defendant being considered. This consideration involves a process in which you must apply your reasoned judgment in deciding whether the situation calls for life imprisonment or requires the imposition of the death penalty, in light of the totality of the circumstances present. If you are not all convinced that death is the appropriate penalty, the sentence must be life imprisonment.
>
> *Regardless of the findings you have made in steps one, two and three, you do not have to return a verdict of death. There is never a requirement that you must impose a death sentence in any situation.*

(Emphasis added.) Thus, considered as a whole, the instructions properly informed each juror that he or she could consider any mitigator even though the jury had not unanimously found such mitigator to exist.

For the same reasons as discussed above, we reject the defendant's argument that the instruction improperly imposed the burden on the prosecutor to prove the existence of mitigators beyond a reasonable doubt. Although this interpretation is plausible as a matter of grammatical construction, there is not a reasonable likelihood that the jurors interpreted the instruction in the manner suggested by the defendant. Further, we note that Instruction No. 4 told the jury that "[t]here is no burden of proof as to proving or disproving mitigating factors...." Thus, for the jury to have adopted the defendant's strained interpretation of Instruction No. 5, it would have had to specifically disregard Instruction No. 4. A reasonable juror would not have adopted such an unreasonable interpretation of Instruction No. 5, contrary to the clear language of Instruction No. 4. Thus, the defendant's contention is without merit.

F. The Jury's Sense of Responsibility

The defendant also objects to Instruction No. 10 which states:

> You are instructed that for the purposes of sentencing, Count I, Murder In The First Degree After Deliberation and Count II, Murder in the First Degree, Felony Murder merge, and the defendant would receive a life sentence on these two counts.
>
> The Court has sentenced the defendant to a single life sentence on Count III, Conspiracy to Commit Murder In The First Degree, Count IV, Second Degree Kidnapping, and Count V, Conspiracy To Commit Second Degree Kidnapping. The decision on whether to impose concurrent or consecutive life sentences is upon the Court.

The defendant argues that the instruction told the jury that the defendant would receive a life sentence despite its verdict and thus might have diminished the jury's sense of responsibility in determining whether the defendant should live or die. The defendant's contention is without merit.

33. For example, the defendant offered as mitigators: the age of the defendant at the time of the crime, the emotional state of the defendant at the time the crime was committed, and "[a]ny other circumstance which bears on the question of mitigation."

In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court reversed the defendant's death sentence where the prosecutor argued to the jury that it ultimately did not determine the fate of the defendant because any sentence rendered would be reviewed automatically by the state supreme court. The Court held that the prosecutor's attempt to minimize the jury's sense of responsibility for determining the appropriateness of the death penalty "rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell,* 472 U.S. at 323, 105 S.Ct. at 2636.

However, the *Caldwell* decision is inapplicable here. The clear intent and effect of Instruction No. 10 was to inform the jurors that they should assume, as a starting point, that the least severe penalty the defendant was to receive was two life sentences, and that the defendant might receive concurrent or consecutive sentences. However, the instructions could not possibly have detracted from the clear understanding of the jury that despite those life sentences, if the jury ultimately determined that death was the appropriate sanction, then the defendant would be put to death. We find there to be no reasonable likelihood that the jurors could have understood the instruction as implying that their verdict imposing a death sentence would not be carried out. The defendant's contention is without merit.[34]

V. Prosecutor's Closing Remarks

The defendant objects to certain remarks made by the prosecutor in his closing argument to the jury during the sentencing phase. He claims that the prosecutor: (1) improperly described the impact of Virginia May's murder on her family; (2) urged the jury to respond to defendant's crime with an "eye for an eye;" (3) denigrated the defendant's exercise of his constitutional rights; (4) improperly asked the jury to "sit as the conscience" of the community and to "send a message" to the community; and (5) improperly urged the jury to disregard the defendant's plea for mercy. We reject the defendant's contentions.

A. Impact of the Murder on the Victim's Family

■ In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court reversed the defendant's death sentence on the basis that the trial court had improperly admitted a victim impact statement (VIS) during the sentencing phase of the trial. The defendant in *Booth* was convicted of robbing and murdering an elderly couple. The VIS was part of a special report prepared by the State Division of Parole and Probation that described the defendant's background, education and employment history, and criminal record. The statement described the effect of the crime on the victims' family and included detailed statements from a son of the victims describing his lack of sleep and his depression following his parents' murder and giving his opinion that his parents were "butchered like animals." The victims' daughter stated in the VIS that the murderers could "never be rehabilitated." *Booth,* 482 U.S. at 500, 107 S.Ct. at 2531. The Court held that the information contained in the VIS was "irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth,* 482 U.S. at 502–503, 107 S.Ct. at 2533.

**34.** Instruction No. 8 also informed the jury that "[y]ou must assume that the penalty of death will be carried out if you impose it." In a footnote, the defendant objects to the word "assume" as "fail[ing] to convey to the jury that it was the sole arbiter of Mr. Davis' life." Contrary to defendant's contention, we believe the word "assume" in common parlance appropriately conveyed to the jury that if it voted for death, the defendant would indeed be executed. Further, Instruction No. 7 told the jury that it "must now decide whether the defendant should be sentenced to death or life imprisonment." Also, the arguments of defendant's counsel and of the defendant asking the jury for mercy made it unmistakably clear that the jury was to decide the question of whether the defendant should live or die.

In *South Carolina v. Gathers,* ––– U.S. –––, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Court once again considered the question of the relevance of the status of the victim and the impact of his murder on his family in a capital sentencing case. In *Gathers,* the prosecutor in closing argument extensively reviewed the circumstances surrounding the victim's murder in a park. He read long excerpts from a "prayer card" which the victim possessed at the time of his death and also emphasized that the victim had his voter registration card with him. The Supreme Court, in reversing the defendant's conviction, agreed that the statements regarding the victim's character were unnecessary to an understanding of the circumstances of the crime, and conveyed the suggestion that "[the defendant] deserved a death sentence because the victim was a religious man and a registered voter." *Gathers,* 109 S.Ct. at 2210. The Court compared the *Gathers* case with *Booth:*

> The statements placed before the jury in *Booth* included descriptions of the victims' personal characteristics, statements concerning the emotional impact of the crime on the victims' family, and the family members' opinions about the crime and the defendant. At issue in the present case is a statement of the first sort—one concerning personal characteristics of the victim. While in this case it was the prosecutor rather than the victim's survivors who characterized the victim's personal qualities, the statement is indistinguishable in any relevant respect from that in *Booth.* As in *Booth,* "[a]llowing the jury to rely on [this information] ... could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill."

*Gathers,* 109 S.Ct. at 2210–11. While recognizing that the *Booth* case had left open the possibility that the kind of information contained in a victim impact statement could be admissible if it "relate[d] directly to the circumstances of the crime," *Gathers,* 109 S.Ct. at 2211, the Court found in the *Gathers* case that the statements did not relate to the circumstances of the crime. "The *content* of [the prayer cards], however, cannot possibly have been relevant to the 'circumstances of the crime.'" *Id.* (Emphasis in original.)

The defendant argues that the following comments by the prosecutor in this case violated *Booth's* and *Gathers'* proscription against the introduction of evidence or statements concerning the emotional impact of the crime on a victim's family:

> I want you to remember the phrase, "Equal Justice," because for some in this case life must go on. For Gary May, for Brandon and Krista, for Ginny's parents, Rod and Alice, her brothers and sister. As painful as it is, as empty and hollow as it is, the pain they have borne for this past year they must continue to bear. For them, life must go on. But for one, justice can be equal. Not in the manner, not in the same manner, but justice under the law, because Ginny in that field had no rights, she was not afforded a presumption of innocence. She had no jury. She had no trial. She had an opportunity to beg for her life, to ask for her life, and that begging was met with the butt of a rifle and 14 slugs, hideously pumped into her body.
>
> You, through this past week, and under your oath, have afforded Gary Davis his rights under the law, the presumption of innocence. You have afforded him every right that a constitutional and civilized society should afford to an individual. You now, under the law and under your oath, have the opportunity to do justice, equal justice, and that I urge you to do.

(v. 2A, p. 59) We note that with respect to these assorted comments, the defendant did not object to them contemporaneously and thus our review is limited to determining whether the alleged error rises to the level of plain error. *See Wilson,* 743 P.2d 415. We find that the statements concerning the impact on the victim's family were not improper.

Although there is broad language in the *Booth* and *Gathers* decisions concerning the scope of the prohibition against evi-

dence or statements describing the impact of the murder on a victim's family, upon closer examination, we do not believe these decisions require reversal in this case. In *Booth,* the Court found that the presentation of the VIS describing in detail the impact of the victims' murders on their family created a "constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth,* 482 U.S. at 502–503, 107 S.Ct. at 2533. The Court held that allowing the jury to rely on a VIS could result in the jury imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence, the Court held, could divert the jury's attention away from the defendant's background and record, and the circumstances of the crime. *Booth,* 482 U.S. at 505, 107 S.Ct. at 2534. The death sentence should not "turn on the perception that the victim was a sterling member of the community rather than someone of questionable character." *Booth,* 482 U.S. at 506, 107 S.Ct. at 2534. Also, the presentation of such evidence offered the prospect of a mini-trial as the defense sought to rebut evidence of a victim's character, thereby distracting the jury from its constitutionally-required task of determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime. *Booth,* 482 U.S. at 507, 107 S.Ct. at 2535.

The Court also rejected statements from family members as to their feelings regarding the crime because "the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth,* 482 U.S. at 508, 107 S.Ct. at 2536. In *Gathers,* similarly, the Court reversed the death sentence after the prosecutor, during closing argument, focused extensively on the character of the victim. The content of the victim's prayer cards did not "provide any information relevant to the defendant's moral culpability." *Gathers,* 109 S.Ct. at 2211.

We do not believe that the prosecutor's comments in this case implicate the concerns addressed by the Court in its *Booth* and *Gathers* decisions. We note that unlike the extensive comments in *Booth* from the victims' children regarding the effect of their parents' murder, the statements by the prosecutor here were couched in the most general terms, speaking of the "pain" and of how "empty" and "hollow" it was for the family after the murder. These statements did no more than state the obvious by speaking of the grief and the anger of the family caused by the murder. When these isolated statements, taking up less than seven lines in more than ten pages of the transcript of the prosecutor's closing argument, are considered in context, it is unlikely that the admission of these statements created a "constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth,* 482 U.S. at 502–03, 107 S.Ct. at 2534. Further, as the Court recognized in *Booth,* a defendant's degree of knowledge of the probable consequences of his actions may increase his moral culpability in a constitutionally significant manner. *Booth,* 482 U.S. at 505, 107 S.Ct. at 2534.

Here, unlike in *Booth,* the defendant can be charged with knowledge of the likely effect of his crimes on the victim's family. The defendant knew the victim and had met her husband. Further, he kidnapped the victim in front of one of the children. He knew she had children and used the offer to drop off clothes for the children as part of the scheme to kidnap May. He and Becky Davis met with family members during the long, futile search for May. He spoke with May's brother, Don MacLennan, and told him that he was sorry to hear what had happened. (v. 25, p. 276) He was also present when his wife assured members of the MacLennan family that "[w]e dearly loved Ginny and we're good Christian folks and we want to do everything we can to help you find your daughter." (v. 24, p. 163) Thus, he cannot claim that it was not foreseeable that his actions would cause the victim's family "pain" and

"emptiness." In this respect, this case is also unlike *Gathers* where the defendant could not be charged with having knowledge of the aspects of the victim's character emphasized by the prosecutor including his religiousness or his civic-mindedness. Such evidence was not relevant to the defendant's moral culpability in *Gathers* and thus was properly excluded.

The brief mention of the victim's family was also proper for another reason: the defendant invited such comment. Becky Davis, a defense witness, testified through previously recorded testimony in the guilt phase that the defendant had destroyed the lives of the victim's family.[35] (v. 33, p. 67) The defendant in his allocution stated that he was "sorry to the family." Also, his counsel stated in closing argument that "if [he] thought that [the children] would have five seconds of peace by Gary Davis's death, [he] would choke the life out of him...." (v. 2A, p. 52) The prosecutor's passing reference to the victim's family suggested to the jury that justice required more than "an apology" from the defendant. It rebutted the defendant's implicit argument that a death sentence would provide little comfort to the children by urging that "justice" would indeed provide some comfort. *See People v. Saiz,* 660 P.2d 2 (Colo.Ct.App.1982) (prosecutor could properly make statement in rebuttal portion of closing argument in second degree assault prosecution that nobody knew whether complaining witness had been satisfied with defendant's apology when defendant himself opened door on subject by claiming that witness was apparently satisfied with defendant's apology); *see also State v. Clark,* 108 N.M. 288, 302, 772 P.2d 322, 333–34, *cert. denied,* — U.S. —, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989) (court holds proper prosecution's argument that life of victim was worth defendant's life "in the scales of justice" in light of defense counsel's closing argument that victim was gone and there was nothing the jury could do to bring her back).

We conclude that the brief mention of the impact of the murder on the victim's family was not improper in this case. Further, even if it was error for the prosecutor to mention the victim's family under the *Booth* and *Gathers* decisions, we conclude that the error was harmless beyond a reasonable doubt. The brief mention of the victim's family did no more than point to a fact which was an obvious consequence of the defendant's crime and of which the jury was undoubtedly aware: the defendant's crime had caused much pain and suffering to the victim's family.[36]

### B. Other Comments by the Prosecutor

The defendant also objects to that portion of the prosecutor's remarks urging the jury to provide "equal justice." He did not object to this remark at trial and thus it must be reviewed under plain error analysis. The defendant argues that this language was especially egregious because "the prosecutor disparaged Mr. Davis's exercise of his constitutional rights, improperly arguing that the criminal justice system coddles an accused by extending to him procedural rights," and that the jury had "given the guy a fair trial and could now hang him." Our review of the record indicates that the prosecutor did not make such statements to the jury and the statements the prosecutor did make could not be fairly characterized as implying the attitude suggested by the defendant.[37] Further, al-

35. Becky Davis did not testify in person at trial; however, a transcript of the testimony she gave at her trial was read to the jury.

36. We note that at trial the following family members testified: Gary May, the victim's husband, James MacLennan, the victim's brother, Rod MacLennan, the victim's father, Don MacLennan, the victim's brother, and Sue MacLennan, the victim's sister-in-law. Thus the indication to the jury that the victim had a family and that the family suffered as the result of the loss of Virginia May did not draw the attention of the jury to any factor of which it was not already aware.

37. Also the record indicates that it was defense counsel who first introduced the notion of "equal justice" into this trial. During opening argument in the guilt phase, defendant's counsel told the jury that "[t]his case will be about life or death, and we're asking that you provide equal justice under the law." [v. 24, p. 36] Thus, the defendant cannot now complain that there

though the defendant assigns improper motives to the prosecutor in contrasting the defendant's murderous treatment of Virginia May with the way a civilized society deals with a person such as the defendant, we cannot conclude that on their face the remarks improperly appealed to the prejudice or passion of the jurors. We reject the defendant's contention. *See People v. McDowell,* 46 Cal.3d 551, 572–73, 250 Cal. Rptr. 530, 541–42, 763 P.2d 1269, 1281 (1988), *cert. denied,* — U.S. —, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989) (court rejects argument that prosecutor's statement that defendant had a right to plead for mercy but that no one could plead for the victim's life was proper argument and did not imply that defendant was not entitled to constitutional rights).

The defendant also objects to the prosecutor's statements in closing that "[t]his is an act that you must now send a message to the community on" [v. 2A, p. 48] and that "[y]ou know that you sit as the conscience of your community." [v. 2A, p. 49] The defendant argues that such comments are improper. However, although such remarks would be improper in the guilt phase of the trial, the very function of a *sentencing* jury in a capital case is to "express the conscience of the community on the ultimate question of life or death." *Booth,* 482 U.S. at 504, 107 S.Ct. at 2533. Further, we have recognized that deterrence is a valid penological goal. Thus, the prosecutor's urging of the jury to "send a message" was not improper.

The defendant also challenges the following remark of the prosecutor during the sentencing phase, to which he did object at trial:

> Ladies and gentlemen, you will have all the instructions. You can read them all. You will see how they all fit together. I urge you to do that, because your job here is to follow the law, to the extent that Mr. Truman asks you to disregard it. I urge you to disregard him.

[v. 2A, pp. 57–58] The defendant argues that the prosecution, by this statement, was telling the jury that mercy was an improper consideration in the determination of a sentence. We disagree. The clear import of these remarks, considered in the context of the prosecutor's rebuttal, was as a response to defense counsel's assertion during his closing statement in the sentencing phase that "[t]hou shall not kill," implying that the biblical command and not the law of the state should guide the jury. [v. 2A, p. 52] Thus, it was not improper for the prosecutor to comment that the jury should follow the law, and not the defense counsel's arguments which implied that the law was wrong.

## VI. *Defendant's Testimony Regarding the "Under Sentence of Imprisonment" Aggravator*

The defendant argues that the trial court improperly allowed the jury to consider defendant's guilt-phase testimony in deciding whether the prosecutor had proven beyond a reasonable doubt the existence of the statutory aggravator defined by section 16–11–103(6)(a), that the defendant was under sentence of imprisonment at the time he murdered Virginia May. Before he testified during the guilt phase of the trial, the defendant was assured by the court that any admission of the existence of prior felonies could only be considered for credibility purposes at each phase of the trial.[38] On cross-examination of the defendant during the guilt phase, the defendant admitted to his previous convictions. According to

is something inherently improper in the term "equal justice."

38. In assuring the defendant that the prosecution would have to prove the existence of the prior felonies through independent evidence, the court may have relied on our decision in *People v. Chavez,* 621 P.2d 1362 (Colo.), *cert. denied,* 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981). In *Chavez,* we held that if a defendant facing an habitual criminal charge testified in his own defense during the trial of the underlying offense, the prosecution could not use the defendant's testimony concerning his prior convictions to prove the elements of habitual criminality. Instead, the prosecution must prove habitual criminality through independent evidence. *Chavez,* 621 P.2d at 1365–67. We express no opinion on the applicability of *Chavez* to the proof of statutory aggravators in the death-sentencing phase of a capital trial.

the defendant, the prosecutor then improperly relied on this admission in proving the existence of the prior felony convictions as an aggravator. The defendant argues that the prosecutor should have proved this aggravator with independent evidence.

The prosecutor has the burden to prove beyond a reasonable doubt that each statutory aggravator exists. § 16–11–103(1)(d), 8A C.R.S. (1986). The People concede that in this case the defendant's guilt-phase testimony could not be used to prove the existence of the aggravator. During the guilt phase, the court instructed the jury that it was not to consider the defendant's testimony respecting his prior convictions for any purpose other than credibility. However, the defendant did not request a similar instruction during the sentencing phase and we do not believe that the judge was required *sua sponte* to give such an instruction. Moreover, our review of the record persuades us that the prosecutor did establish this aggravator through evidence independent of the defendant's testimony.

First, the prosecutor presented what was designated Exhibit 109. Exhibit 109 consisted of a certificate signed by the chairman of the parole board certifying that the defendant was paroled on July 22, 1985, and was due to be discharged from parole on July 22, 1986. Second, the prosecutor presented what was designated Exhibit 108. Included in Exhibit 108 was a "register of actions." Relevant here, it was certified by the district court and it indicated that the defendant had pled guilty to sexual assault in the first degree, and had been sentenced to eight years imprisonment. Also, part of Exhibit 108 was a copy of the plea agreement in that case which indicated that the defendant was charged with sexual assault in the first degree, listed the elements of that charge, and stated that the defendant had entered a plea of guilty. Also in Exhibit 108 was a copy of the written advisement of rights given to the defendant at the time of his arrest, indicating that he had been charged with sexual assault in the first degree, and had been advised of his rights and had posted $10,000 bail. Finally, Becky Davis stated in her videotaped testimony that on the day of the murder, the defendant was celebrating his last day of parole. (v. 33, p. 41)

Considering this evidence in the light most favorable to the prosecution, *People v. Jones,* 191 Colo. 110, 551 P.2d 706 (1976), we find it is sufficient to support the jury's finding that, beyond a reasonable doubt, the statutory aggravator existed.

### VII. *Admission of Exhibits on Defendant's Prior Crimes*

The defendant argues that the trial court improperly admitted Exhibit 108. He claims that the prosecution is required to present "duly authenticated court records of judgment, conviction, sentence and mittimus" in order to prove the existence of the statutory aggravator that the defendant was under a sentence of imprisonment at the time he murdered May. Further, the defendant argues that the evidence of the facts underlying the previous convictions should not have been admitted.[39] The defendant did not object to the admission of this exhibit, thus we consider its admission under the plain error standard.

First, we find that it was not improper for the prosecutor to prove the "under sentence of imprisonment aggravator" through the documents contained in Exhibit 108. The defendant has pointed to no authority, and we see no other basis for adopting a rule requiring the submission of the mittimus or other particular document to establish this aggravator when there is no reason to question the authenticity and accuracy of the documents used here.

Defendant also argues that in *People v. Borrego,* 774 P.2d 854 (Colo.1989), we held that section 16–11–103(6), which establishes that a person's prior felony conviction is an aggravating factor, does not

39. The documents admitted here indicated that the victim in the defendant's prior case had been threatened with imminent death, serious bodily injury, extreme pain and kidnapping, and that the defendant was armed with a knife.

provide for the admission into evidence of the underlying factual circumstances of that prior crime. However, a closer reading of *Borrego* reveals that the holding in that case, sustaining the trial court's refusal to allow the prosecutor during the sentencing phase of that capital case to present evidence of the underlying factual circumstances of the defendant's prior convictions, was based upon "[t]he plain language of 16-11-103(1)(b) [which] grants the trial judge wide discretion to determine what evidence is relevant and admissible." *Borrego,* 774 P.2d at 855. Thus, we held that the trial court's ruling was "not an abuse of discretion." *Id.* at 856. Here we believe that the evidence was properly admissible as part of the relevant evidence concerning the nature of the crime, the character, background, and history of the defendant. § 16-11-103(1)(b). Under this section, all of such evidence is admissible at the trial court's discretion. *See also, People v. Saathoff,* 790 P.2d 804 (Colo.1990) (court disapproves of trial court ruling that evidence of defendant's prior convictions was inadmissible because such evidence did not comprise a specific aggravator). In the absence of an objection, asking the trial court to exercise its discretion to exclude such evidence, we find no error.

## VIII. *Sentencing on Defendant's Non-Capital Convictions*

Defendant argues that the trial court improperly sentenced him on his non-capital convictions following the guilt phase and that this prejudiced him in the sentencing phase because the jury was precluded from considering the full mitigating effect of the proper sentence. The defendant claims that the error consisted of the failure to sentence him to separate life sentences, pursuant to the habitual criminal statute, sections 16-13-101 to -103, 8A C.R.S. (1986 & 1989 Supp.), on the counts of conspiracy to commit murder in the first degree, second-degree kidnapping, and conspiracy to commit second-degree kidnapping. The defendant reasons that the trial court, acting in its discretion, could have sentenced the defendant to consecutive life sentences. Such consecutive sentences might have convinced the jury, the defendant argues, that death was not an appropriate sentence, particularly as it considered the statutory mitigating circumstance that "the defendant [was] not a continuing threat to society." We are not persuaded by the defendant's argument.

First, we note that the defendant did not object to the trial court's allegedly improper sentencing. Thus, we must review this error under plain error analysis. Although the trial judge, pursuant to the habitual criminal act, should have returned three life sentences, *see People v. Early,* 692 P.2d 1116, 1121 (Colo.Ct.App. 1984) (court holds that habitual criminal statute substitutes more severe sentencing range for each substantive offense), the trial court was not required to impose consecutive sentences in this case.[40] Further, we find that even if a consecutive sentence would have been proper, the trial court did not err in postponing such sentencing until after the sentencing phase of the trial. Crim.P. 32(b) establishes the procedures required to be followed in sentencing. It requires that sentence be imposed without an "unreasonable delay." It also provides, however, that:

> Before imposing sentence, the court shall afford the defendant an opportunity to make a statement in his own behalf, and to present any information in mitigation of punishment. The state also shall be given an opportunity to be heard on any matter material to the imposition of sentence.

When the court must sentence both for a class 1 felony and for other felonies, as in this case, it is not inappropriate to delay final sentencing on the other felony convictions until after the class 1 felony sentencing hearing. Under this procedure, the trial court can take full advantage of the procedures of the class 1 sentencing hear-

40. *See People v. Montgomery,* 669 P.2d 1387, 1389 (Colo.1983) (The imposition of concurrent sentences is required only where the counts for which a defendant is convicted are supported by identical evidence; otherwise the sentencing court has discretion to impose sentences to be served concurrently with or consecutively to each other.).

ing where all of the factors relevant to sentencing are considered. The failure of the defendant to object to the trial court's delay in resolving the question of consecutive versus concurrent life sentences may well have been part of a calculated strategy to obtain the least severe sentence possible. Defense counsel may have hoped that the jury would return a verdict of life imprisonment and that the judge then would impose concurrent life sentences after considering all of the mitigating circumstances presented by the defendant. Under these circumstances, we conclude that the trial court properly declined to determine whether defendant's life sentences were to be concurrent or consecutive prior to the capital sentencing hearing.

IX. *Exclusion of Prospective Jurors for Cause*

Defendant argues that the trial court improperly granted the prosecutor's motion to challenge three jurors for cause. Before considering defendant's specific objections as to the three jurors, it is useful to review the standards this court has adopted regarding challenges for cause. We considered this very issue in the context of Colorado's death sentencing scheme in *Drake,* 748 P.2d 1237. The defendant in *Drake* argued that the exclusion of prospective jurors on the basis of their opposition to capital punishment was forbidden by the Sixth Amendment. We rejected the defendant's argument, holding:

> [The] exclusion of prospective jurors solely on the basis that they are unable under any circumstances to impose the death penalty serves the state's legitimate interest in having a single jury that can consider the facts impartially and conscientiously apply the law in the case at both the guilt-innocence and sentencing phases of a capital trial.

*Drake,* 748 P.2d at 1245. In *Drake* we did not determine the proper standard for resolving challenges for cause in capital cases. The defendant points to the case of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as establishing the appropriate standard for evaluating challenges for cause based on a juror's beliefs about the death penalty. In *Witherspoon,* the Court held that the state could exclude for cause persons who make it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Witherspoon,* 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21 (emphasis in original).

However, as the defendant concedes, the Supreme Court modified the *Witherspoon* standard in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). In *Witt,* the Court determined that a juror may be excluded because of his views on capital punishment if "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt,* 469 U.S. at 424, 105 S.Ct. at 852 (footnote omitted). The Court rejected the argument that the prosecutor need show that the juror would "automatically" vote against the death penalty. The defendant concedes that *Witt* establishes the proper standard for evaluating challenges for cause under the federal constitution but argues that the standard applicable in Colorado was adopted long before either *Witt* or *Witherspoon* in the case of *Stratton v. People,* 5 Colo. 276 (1880). In *Stratton,* this court reviewed the exclusion of three jurors who had expressed reservations about capital punishment. The court reversed the conviction of the defendant, finding that the trial court erred in disqualifying the jurors, stating:

> Conscientious scruples against the infliction of the death-penalty do not necessarily disqualify a juror entertaining them. They must be such as would preclude him finding a verdict of guilty in a capital case, or from trying it fairly.

*Stratton,* 5 Colo. at 277.

The defendant urges, without textual support from the *Stratton* opinion itself, that this court's opinion in that case must have been based on Article II, Section 16 of

the Colorado Constitution guaranteeing a fair and impartial jury. The defendant also argues that our decision in *Young v. People,* 175 Colo. 461, 467–68, 488 P.2d 567, 570 (1971), holding that the *Witherspoon* standard for exclusion of jurors was not "inconsistent with the law of the state," also implies that there is an independent standard under state law. We disagree with the defendant's interpretation of the prior decisions of this court and hold that the exclusion of jurors on the basis of their scruples regarding the death penalty is governed by the standards enunciated by the Supreme Court in *Witt.*

First, under Colorado law at the time of the *Stratton* case, the jury did not sentence the defendant. The sole function of the jury was the determination of guilt or innocence.[41] Following the determination that the defendant was guilty of the charge, the judge then sentenced the defendant. Under such circumstances, the standard stated by the court in *Stratton* is proper: there is no basis for excluding a juror merely because he would be unwilling to do that which the law did not require him to do. As long as the juror, despite his reservations about capital punishment, could properly determine the question of guilt, he could not be challenged for cause. Thus, we reject the defendant's argument that challenges for cause under our current bifurcated sentencing scheme are reviewable under the standard enunciated in *Stratton,* and instead will consider whether the trial court properly applied the *Witt* standard.[42]

In reviewing the trial court's ruling excluding the three jurors for cause in this case, we note that the trial courts are afforded broad discretion in ruling on challenges for cause to prospective jurors, and decisions denying such challenges will be set aside only when a clear abuse of discretion is disclosed by the record. *Drake,* 748 P.2d at 1243. We are deferential to the trial court in such matters because "the trial judge is the only judicial officer able to perform the critical assessments by personal observation of the credibility and demeanor of a prospective juror." *Id.* at 1243. Guided by these principles, we now address defendant's arguments as to the propriety of the challenges for cause to particular jurors.

A. Thelma Wolfe

After permitting extensive *voir dire* examination of Wolfe by both the prosecutor and the defense counsel, as well as questioning the prospective juror himself, following in chambers questioning of Wolfe the trial judge made the following ruling:

> I think based upon Mrs. Wolfe's indication that she may already have formed an opinion in this case, that, coupled with her inability really to make a determination as to whether or not she could or could not make a decision whether the case is one for the death penalty, combined with the two, I will excuse [her] for cause under the circumstances.[43]

[v. 21, p. 1099] Our review of the record indicates that the trial court's decision is supported on both bases proffered by the

41. *See Colorado General Laws,* Ch. XXIV, Criminal Code, § 268 (1877) (judge may sentence defendant to death if the jury finds that the killing was deliberate or premeditated or done in the perpetration of or attempt to perpetrate some felony).

42. Section 16–10–103(1)(j), 8A C.R.S. (1986), states:

> ***Challenge of jurors for cause.*** (1) The court shall sustain a challenge for cause on one or more of the following grounds:
>
> . . . . . .
>
> (j) The existence of a state of mind in the juror evincing enmity or bias toward the defendant or the state; however, no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;
>
> ....

This statutory standard, applicable in both capital and non-capital trials, is entirely consistent with the standard adopted in *Witt. See also* Crim.P. 24(b)(1)(X).

43. The trial court examined all the prospective jurors in chambers.

court. First, with respect to the juror's inability to make a determination at the death sentencing phase, in response to several questions by the prosecutor, Wolfe told the court: "I don't think I could vote for the death penalty," [v. 21, p. 1085], and "I don't think that I could make that decision," [v. 21, p. 1086], and "I think he probably should be in for life, but I don't think that I could vote for that," [v. 21, p. 1089], and "I don't think I could sentence someone to be—to the death penalty," [v. 21, p. 1090]. Although, upon further examination by defense counsel, Wolfe indicated that she would be able to follow her oath, this is not decisive.[44]

We believe that the record supports the trial court's granting of the challenge for cause. By Wolfe's own admission, she did not think she could ever return a verdict of death regardless of the circumstances. These statements meet the standard adopted in the *Witt* case. Clearly the trial court could properly find that Wolfe's views on capital punishment would "substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Witt,* 469 U.S. at 424, 105 S.Ct. at 852. Although there is some support in the record for the defendant's contention that Wolfe would abide by her oath, the other statements, as discussed above, indicated that it was probable that her conscientious scruples would make her unable to consider whether, pursuant to our laws, death was the appropriate sentence in this case.

We also find that the court was correct in disqualifying Wolfe because of bias. A trial court must sustain a challenge for cause of a potential juror if there exists a state of mind in the juror evincing

**44.** During defense counsel's voir dire of Wolfe, the following exchange occurred between the defense counsel, Wolfe, the prosecutor and the court (v. 21, pp. 1095–97):

(by defense counsel)

Q. Are you telling me that your feelings about the death penalty are so darn strong that if you were placed under oath to follow the law that you would not follow it if it meant considering whether a death penalty was appropriate?

(by juror Wolfe)

A. I don't know. I would have to wait until I get there.

Q. And it is unfair of us to ask these questions in the abstract without taking a look at them, but we have to do it. I can't tell you what the case is about. We can't try this case here in front of you.

If you're on the jury under oath, even though I know you don't like the death penalty, and you don't believe in the death penalty, if you were under oath and you knew the law in Colorado was that you had to consider the death penalty, and if it were appropriate return a death verdict, would you follow that oath?

A. I would have to, I suppose.

Q. You wouldn't like it?

A. No, I certainly wouldn't.

Q. But you would do it?

A. I would have to, yes, if I took the oath.

. . . . .

(by the prosecutor)

Q. We know you would want to follow the law, but we need to know if you truly can do it.

A. I really don't know. I really can't give you a straight answer to that, because I don't really believe in it, but I don't know.

Q. We're kind of back to square one, Mrs. Wolfe.

A. Right. I don't think you will get any better either. I can't give you a straight answer. I don't believe in it, but if everything leads to it and it is really—oh, I don't know.

(by the court)

Q. I think you are trying to express your opinion and that's what we want to hear so go ahead, Mrs. Wolfe. Tell us.

A. I'm finished. I really—I just—I don't know. I couldn't say until I actually get there. I really don't believe in it. I know I keep going back and forth, but it would certainly have to be really—

Q. May I ask you some questions, Mrs. Wolfe?

I think what you have indicated—and let me know if I'm coming off wrong—but what you said is, you don't believe in the death penalty, but that's not really that strong a conviction, am I correct there?

A. Yes, pretty much.

Q. That you can see where under certain circumstances you feel it may be appropriate, am I right there?

A. I—yes.

Q. Do you feel—and, you know, this is just the bottom line—do you feel that under those circumstances, can you think of a case where you would be willing to vote for the death penalty—and I am not going to ask you what case it would be—but in your own mind think, oh, yeah, if such and such and such I could vote for it?

A. Oh, gee. Right off I can't think of—I can't think of anything right off. I have never put myself in that position if I really would vote. Not a very good answer. It can't be a yes or no answer, as far as I'm concerned.

enmity or bias toward the defendant or the state. § 16-10-103(1)(j), 8A C.R.S. (1986); *People v. Sandoval,* 733 P.2d 319 (Colo. 1987). Wolfe indicated to the judge that she was "sure he's guilty." [v. 21, p. 1082] When asked whether she was willing to set aside her feelings, she responded, "I'm not saying I'm willing, but I would try." [v. 21, pp. 1083-84] Although some of the answers given were more equivocal on this point, we cannot displace the trial court in its role as evaluator of credibility. We are in no position, on appellate review of a cold record, to judge which of a juror's inconsistent or equivocal answers rings the most true; it is for the trial judge to perform such evaluation. *Drake,* 748 P.2d at 1243.

B. Abie Olivas

The trial court also granted the prosecutor's challenge for cause to prospective juror Abie Olivas. During the initial in-chambers interview, the prosecutor did not offer any challenge to Olivas. When questioned during that initial session, Olivas told the court that he was "about right in the middle" on the question of capital punishment. Olivas stated that he felt the Colorado scheme to be reasonable and that he would not impose a sentence of life in every case. He also told the court that he would have to hear the evidence before he made up his mind on the question of whether Davis deserved to die. Although the prosecutor took no quarrel with the views Olivas expressed in this initial interview, during the subsequent general *voir dire* of the prospective jury panel, Olivas learned that intoxication would be an issue in the case and told the court that he did not think he could vote for the death penalty under such circumstances. Olivas stated:

> I was caught for a DUI, see, and they sentenced me to 36 weeks of therapy, 10 weeks was education and 26 weeks was therapy, and I learned a lot about alcohol, and I don't think that I could give a death penalty because I think it's a sickness and I don't think I could send a sick man to the gas chamber or electric chair.

[v. 23, p. 1500] Olivas revealed to the court that his experiences with alcohol convinced him that it was a disease. These experiences included his own arrest, conviction and sentence for driving under the influence, his father's death from cirrhosis, and his brother's affliction with cirrhosis. He unequivocally stated that if there was alcohol involved, "I would not consider the death penalty." [v. 23, p. 1504] In response to a hypothetical question posed by the defense counsel, Olivas made it clear that any consumption of alcohol by the defendant, no matter how slight in amount or how remotely connected to the commission of the crime, would prevent him from voting to impose the death penalty.

The court, in granting the prosecution's motion to challenge Olivas for cause, made the following ruling:

> I would indicate for the record that the jury, or a juror, has the right to determine what a mitigating fact is, and I'm not going to prejudge any mitigating fact. In this particular case Mr. Olivas has indicated that he cannot be a juror in this case because he can't balance mitigating facts against aggravating facts; that his statement was, if there's any indication at all that the defendant in this case used any amount of alcohol at any time, that he would then be unable to balance aggravating factors against mitigating factors. The mere fact there would be any evidence of the fact that any alcohol was used at any time, that that factor alone would make his decision. In making a decision to whether or not to accept a juror in this case, the Court has to determine whether or not, in fact, that juror is capable and willing to follow the law. The law as to the death penalty is that a juror must be willing to weigh aggravating factors found beyond a reasonable doubt against mitigating factors, to determine whether or not in this case it would be appropriate for either life or death; that Mr. Olivas has indicated if there is any evidence concerning alcohol, that he could not perform this function, and it is for that reason the Court has excused him for cause.

[v. 23, pp. 1515–1516] The defendant argues that the trial court's granting of the prosecutor's motion to challenge for cause was improper. He points out that under *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), the jury is allowed to consider all mitigating circumstances of the crime. Further, the defendant argues, the juror determines the weight he or she deems appropriate to the mitigating evidence. *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982).

However, although the juror may properly consider all relevant mitigating evidence and may determine what weight to give such evidence, the juror is still required to follow the requirements of our statute and weigh the aggravating circumstances against the mitigating circumstances. For a prospective juror to state that in any case involving the use of alcohol, no matter how little, the juror will not return a death sentence, is to admit that such juror would not follow the law of this state. The exclusion of Olivas was proper under the *Witt* standard: Olivas' statements indicated that his views on alcohol would "substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." Our legislature has not recognized the use of alcohol, no matter how inconsequential, as an absolute mitigating factor forbidding the imposition of a death sentence. Thus, the court's granting of the challenge for cause was proper.

C. Michael Bradbury

The defendant argues that the trial court improperly excluded Michael Bradbury because the exclusion was based on an improper statement of the law. After both the prosecutor and the defense counsel elicited from Bradbury somewhat equivocal and ambiguous answers to questions designed to determine whether Bradbury was opposed, in principle, to capital punishment, the court posed the following question to Bradbury:

> Well, Mr. Bradbury, you have gone down this line where you have found the aggravating factors, they outweigh the mitigating factors; that means that under following the law that you would have to find the death penalty. Are you saying that under those circumstances, that even though logically that would be the conclusion, that you could not follow it?

[v. 17, p. 232]

Although the prosecutor advised the court that the question did not accurately state the law of Colorado, the court persisted and the juror responded that he would not return a verdict of death even if he found that aggravating factors outweighed mitigating factors. The defendant correctly points out that under Colorado law, a finding that mitigating factors are insufficient to outweigh aggravating factors does not require the jury to return a sentence of death if the jury does not believe that death is the appropriate sentence. However, although the court's hypothetical question did not accurately convey the law of Colorado, we believe it was an appropriate device for ascertaining whether the juror was inalterably opposed to capital punishment. If, as Bradbury indicated, he was unwilling to return a sentence of death when the law absolutely required him to do so, then the lesser proposition, that he was unwilling to return a death sentence, where under the law it was appropriate but not required, is obviously true. The in-chambers questioning of a member of the venire is not to be equated with the charging of the jury. The purpose of the *voir dire* was not to instruct the jurors on the law of the state but to determine whether the juror could impartially and conscientiously apply the law as laid out by the court in its instructions. Because prospective juror Bradbury indicated that he could not follow the law, his exclusion for cause was proper under the *Witt* standard.[45]

**45.** In addition to Bradbury's responses discussed above, Bradbury several times indicated that he would be unable to render a verdict of death in this case. For example, the following exchanges occurred between Bradbury and the prosecutor:

(by the prosecutor)

### X. *Prosecutor's Use of Peremptory Challenges*

The defendant argues that the use by the prosecutor of six peremptory challenges to remove jurors who had expressed reservations about the death penalty denied the defendant his right to be tried by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article II, Sections 16 and 25 of the Colorado Constitution. The defendant reasons that because under *Witt* a prosecutor may not challenge jurors for cause, on the basis of their disagreement with capital punishment, those prospective jurors whose objections to capital punishment do not prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths, the prosecution may not use peremptory challenges to similarly exclude such persons. We reject defendant's argument.

Although the prosecutor may not use peremptory challenges to systematically exclude members of a distinct racial group, *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court has not extended the holding of *Batson* to include those who harbor reservations about capital punishment. Also, we have stated that "the Constitution does not require a jury composed of a precise balance of jurors of various philosophical predispositions, but only a jury composed of individual jurors who indicate an ability to set aside any preconceptions they may have and decide the case based on the facts adduced at trial." *Drake,* 748 P.2d at 1245, n. 1. In *Brown v. Dixon,* 891 F.2d 490 (4th Cir.1989), the Fourth Circuit Court of Appeals, in reversing the decision of the district court, rejected the same argument offered by the defendant in that case. In holding that a state may use its peremptory challenges to purge a jury of veniremen not excludable for cause under *Witherspoon,* the court stated:

> Our reading of *Batson* alone compels our holding, for we believe the case does not suggest, and may not even authorize, the principle that courts must scrutinize every peremptory challenge to ensure that it does not tread on any right of the defendant. *Batson* states in so many words that it views the peremptory challenge as, in all but one instance, truly peremptory.... We are unwilling to make the momentous conceptual leap [the defendant] urges on us, a leap that would mean the practical elimination of the peremptory challenge as such. Neither *Batson* nor any other binding or instructive precedent supplies a writ for the conversion of every peremptory challenge to a challenge subject to judicial approval, and we have no confidence that such a conversion would better protect the principles our system of justice seeks to advance than does the current, and historic arrangement.

*Brown,* 891 F.2d at 497–498.

We agree that it is not inappropriate for a prosecutor to use his peremptory challenges to exclude jurors who, although

> Q. So if your were making a decision, regardless of what the evidence is in this case—and you haven't heard any evidence—and you had a choice between imposing a death sentence or a life sentence, what I guess I'm hearing is that you would not consider a death sentence?
>
> A. I couldn't, you know, there would be—I couldn't do that.
>
> ....
>
> Q. I guess what I need to know is, based on your moral and philosophical beliefs against the death penalty, would be able to fairly be involved in that kind of situation, where you would have to consider the question of death as an appropriate punishment?
>
> A. I would be able to consider it, but I strongly don't think you know—well, that's all the further it would go would be like a consideration. I know almost positively to myself, I would never, you know—I mean, the consideration would be there all this time, it would have to be there, but that's all it would be is a consideration.
>
> Q. So you could think about it but you could never vote in favor of a death verdict?
>
> A. No, I could never do something like that, never.
>
> Q. And you understand what we're talking about is precisely that?
>
> A. Yes.

(v. 17, pp. 224–26). Thus, the record fully supports the court's exclusion of prospective juror Bradbury.

they have indicated they can follow the law, have expressed reservations about their ability faithfully to do so or who have indicated that they disagree with the judgment of the people acting through their legislature that certain crimes are deserving of the ultimate penalty.[46]

XI. *Defendant's Right to Waive a Jury Trial*

Prior to both the guilt phase of the trial and the sentencing phase, the defendant sought to waive his right to a trial by jury and instead to have his case tried to the court. The trial court refused, holding that such waiver required the consent of the prosecutor and that because it was not forthcoming here, the defendant could not waive the trial and sentencing by the jury. The defendant argues that the court's refusal to waive the trial by jury requires that his sentence be vacated and that the case be remanded to the trial court for entry of a sentence of life imprisonment.[47] We hold that the trial court properly conditioned the defendant's waiver of a jury trial on the consent of the prosecution.

In arguing that his right to waive a jury trial in a capital case is unconditional, the defendant first points to the language of section 16–11–103(1)(a), 8A C.R.S. (1986). That section provides:

> **Imposition of sentence in class 1 felonies—appellate review.** (1)(a) Upon conviction of guilt of a defendant of a class 1 felony, the trial court shall conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment, unless the defendant was under the age of eighteen years at the time of the commission of the offense, in which case the defendant shall be sentenced to life imprisonment. The hearing shall be conducted by the trial judge before the trial jury as soon as practicable. Alternate jurors shall not be excused from the case prior to submission of the issue of guilt to the trial jury and shall remain separately sequestered until a verdict is entered by the trial jury. If the verdict of the trial jury is that the defendant is guilty of a class 1 felony, the alternate jurors shall sit as alternate jurors on the issue of punishment. If, for any reason satisfactory to the court, any member or members of the trial jury are excused from participation in the sentencing hearing, the trial judge shall replace such juror or jurors with an alternate juror or jurors. *If a trial jury was waived* or if the defendant pleaded guilty, the hearing shall be conducted before the trial judge.

(Emphasis added.) The defendant contends that under the plain language of this section, the legislature contemplated a waiver of the right to a jury trial in a capital case. Further, because there exists no provision conditioning this right of waiver on obtaining the consent of the prosecution, the right must lie unconditionally with the defendant. The defendant acknowledges that section 18–1–406(2), 8B C.R.S. (1986), the general provision governing the waiver of jury trials, on its face suggests that waiver may not be permissible in a capital trial. That section provides in relevant part:

> *Except as to class 1 felonies,* the person accused of a felony or misdemeanor may waive a trial by jury by express written instrument filed of record or by announcement in open court appearing of record.

(Emphasis added.) The defendant argues, however, that section 16–11–103(1)(a), because it was subsequently enacted, prevails

46. We note that the prosecutor used only 10 of his 12 peremptory challenges. Further, at least two jurors served who indicated substantial reluctance to impose the death penalty. One juror who served stated he had "apprehensions" against capital punishment, and had argued against it during informal discussions. (v. 20, pp. 900–01) Another juror who served opined that only "extreme cases" should warrant capital punishment. (v. 17, p. 445) Thus the prosecutor here cannot be said to have engaged in an overzealous effort to include on the jury only persons who supported capital punishment without reservation.

47. The defendant purports to waive his objection to the trial by jury during the guilt phase. Because we find no error in the trial court's refusal to allow the defendant a trial to the court, we need not determine the effect of the defendant's waiver of the objection.

over section 18–1–406(2). Also, under *People v. Cisneros,* 720 P.2d 982 (Colo.Ct.App. 1986), *cert. denied,* 479 U.S. 887, 107 S.Ct. 282, 93 L.Ed.2d 257 (1986), according to the defendant, section 18–1–406(2) is ineffective to deny him the right to waive a jury trial because the legislature does not have the power to forbid a defendant from waiving a trial by jury. Before we consider defendant's arguments on the effect of these provisions, it is necessary to review our prior cases in this area.

In *Munsell v. People,* 122 Colo. 420, 222 P.2d 615 (1950), we raised *sua sponte* the issue of whether a defendant has a right to enter a plea of not guilty and waive a trial by jury. In finding that a defendant does have such a right, we considered the language of Section 16, Article II of the state constitution providing that an accused shall have the right to a "speedy public trial by an impartial jury ...," and Section 23 of that Article providing that "[t]he right of trial by jury shall remain inviolate in criminal cases...." We stated in *Munsell* that:

> Under our constitutional provisions, we hold that a defendant may waive his right to a trial by jury, and on a plea of not guilty be tried by the court, and, if found guilty, a valid sentence may be pronounced thereon.

*Munsell,* 122 Colo. at 430, 222 P.2d at 620. However, we recognized an exception to our holding, stating that:

> We are cognizant of a statutory provision which requires a jury to impose sentence in first degree murder cases, and nothing herein should be construed as countenancing the waiver of a jury where the charge is murder in the first degree.

*Munsell,* 122 Colo. at 430, 222 P.2d at 620. Thus, although admittedly there is language in the *Munsell* decision supporting the defendant's argument that *Munsell* recognized a right to waive a trial by jury under the state constitution, a closer examination of that case and subsequent cases rebuts that notion. In *Munsell* itself the court's statement that nothing in the opinion should be construed as being inconsistent with the denial of a right to waive a jury trial in a capital case makes questionable the proposition that *Munsell* established a state constitutional right to waive a trial by jury.[48]

In *Graham v. People,* 134 Colo. 290, 308, 302 P.2d 737, 746 (1956), we reaffirmed our statement of *Munsell* that recognition of the right to waive a jury trial did not extend to a capital case. We rejected the defendant's argument that he could waive a jury trial in a capital case, holding that:

> [I]n a trial for murder the mandatory provisions of the statute require a jury empowered to fix the degree of murder, and if determined to be murder of the first degree, to fix the penalty to be suffered by the defendant, and the trial judge has no duty other than to impose a sentence in accordance with the verdict.

In subsequent cases, where we considered the scope of the right to waive a trial by jury, we stated that the legislature may only "interpose reasonable requirements upon the right to waive trial by jury." *People v. Brisbin,* 175 Colo. 428, 432, 488 P.2d 63, 65 (1971) (court upholds statute requiring prosecutorial consent as condition of waiver of jury trial on question of sanity). However, never have we found that a particular restriction on the right to waive a trial by jury was unreasonable. Further, after *Graham,* all of our cases in this area involved the interpretation of statutes, unlike in *Munsell* where we recognized the right to waive a trial by jury in the absence of a statute.

In *Garcia v. People,* 200 Colo. 413, 615 P.2d 698 (1980), we found that section 18–

48. We observe that the language in our death sentencing statute, mentioning the possibility of waiver, was added in 1974. This language apparently contemplated a change from many decades of procedure where the jury was the sole sentencer and waiver was not permitted. *See Jones v. People,* 155 Colo. 148, 393 P.2d 366 (1964); *Gallegos v. People,* 116 Colo. 129, 179 P.2d 272 (1947); *Wharton v. People,* 104 Colo. 260, 90 P.2d 615 (1939); *Fleagle v. People,* 87 Colo. 532, 289 P. 1078 (1930); *Demato v. People,* 49 Colo. 147, 111 P. 703 (1910). Thus, Colorado's practice of requiring the jury to determine the appropriate sentence in a capital case is longstanding and is not to be lightly discarded.

1–406(2), allowing a defendant to waive a trial by jury "[e]xcept as to class 1 felonies," prevailed over Crim.P. 23(a)(5), which then conditioned the waiver of a jury trial on the consent of the prosecutor. We found that the legislature intended to exclude the prosecutorial consent requirement from section 18–1–406(2) and that because the "right" to waive a jury trial was substantive, the statute not requiring prosecutorial consent prevailed over the court-adopted rule.[49] *Garcia,* 200 Colo. at 415, 615 P.2d at 700.

In *People v. Cisneros,* 720 P.2d 982 (Colo.Ct.App.1986), the court of appeals, relying heavily on *Garcia,* held that the "right" to waive a jury trial applied to all felonies, despite the specific wording of section 18–1–406(2), excluding from that section's waiver provisions class 1 felonies. The court of appeals found that "[s]uch a prohibition does not fall within the ambit of the General Assembly's power to impose *reasonable requirements* upon the right to waive a trial by jury." *Cisneros,* 720 P.2d at 985 (emphasis in original).

In *People v. District Court,* 731 P.2d 720 (Colo.1987), we questioned the holding of the court of appeals in *Cisneros* that the right to waive a jury trial cannot be denied with respect to class 1 felonies, but we found it unnecessary to decide whether that case was properly decided because "*Cisneros* did not suggest that the right to waive a trial by jury cannot be conditioned upon the consent of the court, the prosecution, or both." *People v. District Court,* 731 P.2d at 722. Thus, we declined to overrule *Brisbin* and upheld the provision of section 16–8–105(2) requiring the consent of the prosecutor to waive a trial by jury in cases where a defendant enters a plea of not guilty by reason of insanity.

Our review of the cases in this area, as discussed above, convinces us that the court of appeals in *Cisneros* was incorrect to suggest that the legislature could not forbid a defendant from waiving a jury trial in a capital case. *Munsell* and *Graham* clearly established that the legislature could effect such a prohibition; there is nothing in our subsequent cases retreating from this holding. Our cases demonstrate a broad deference to the legislature with respect to the waiver of the right to a trial by jury. We conclude that the right recognized by *Munsell* is not a right guaranteed by the state constitution, but rather must be characterized as a common law right subject to regulation or abrogation by the legislature. *Munsell,* properly construed, merely stands for the proposition that there is nothing inconsistent in our constitution with the waiver of a trial by jury, and in the absence of legislative action denying such right, it exists under the common law of this state.[50] With these principles as our guide, we now examine the statutes before us in this case.

Section 18–1–406(2), under this court's decision in *Garcia,* grants the defendant the unqualified right to waive a trial by jury. However, by its express terms, that section does not apply to class 1 felonies. Thus, the section does not apply in this case. Section 16–11–103(1)(a), on the other hand, appears to contemplate the possibility that a capital jury might be waived. However, the language of the section itself is insufficient to establish such a right and certainly does not purport to define the scope of the right. There are no other statutory provisions applicable.

In the absence of relevant statutory provisions, this court is guided by the common law of the state as pronounced by the previous decisions of this court. § 2–4–211, 1B C.R.S. (1980). As stated above, under this court's decision in *Munsell,* a defendant has a common law right

**49.** We noted in *Garcia* that there is no right to waive a jury trial under the federal constitution. *Garcia,* 615 P.2d at 699, *citing Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).

**50.** We note that the recognition of a common law right to waive a trial by jury was apparently at odds with the majority rule at common law denying the right to waive a trial by jury. *See generally* discussion of common law on right to waive jury trial in *Singer v. United States,* 380 U.S. 24, 27–37, 85 S.Ct. 783, 786–91, 13 L.Ed.2d 630 (1965).

to waive a trial by jury. Because under our present statutes there exists no superseding statutory provision, that common law right extends to first-degree felonies. Although we did not consider the question in *Munsell,* we now hold that the exercise of that common law right is conditioned upon the defendant's obtaining the consent of the prosecution. *See State v. Durham,* 111 Ariz. 19, 523 P.2d 47 (1974); *State ex rel. Gerstein v. Baker,* 339 So.2d 271 (Fla. Dist.Ct.App.1976); *State v. Kilburn,* 304 Minn. 217, 231 N.W.2d 61 (1975); *Short v. State,* 511 S.W.2d 288 (Tex.Crim.App.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *see also* Annotation, *Right Of Accused, In State Criminal Trial, To Insist, Over Prosecutor's Or Court's Objection, On Trial By Court Without Jury,* 37 A.L.R.4th 304 (1985); and Standard 15-1.2(a), *ABA Standards for Criminal Justice* (2d ed. 1986 Supp.). Here, because the prosecution declined to consent to defendant's attempted waiver of his right to a jury trial, the court properly denied the defendant's motion.

XII. *Court's Statutory Review*

■ Under section 16-11-103(7)(a) and (b) (1986 & 1989 Supp.), this court, in addition to the normal appellate review of all alleged errors, is required to conduct a further review pursuant to that section. Subsections (a) and (b) provide:

> (a) Whenever a sentence of death is imposed upon a person pursuant to the provisions of this section, the judgment of conviction and sentence of death shall be subject to review by the supreme court. The supreme court shall review the propriety of that sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based. Review of the judgment of conviction, the sentence of death, and the propriety of a sentence of death shall be a matter for the supreme court exclusively. Such review by the supreme court shall have priority over all other cases, and the procedures to be employed in the review shall be as provided by supreme court rule.
>
> (b) A sentence of death shall not be imposed pursuant to this section if the supreme court determines that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor or that the evidence presented does not support the finding of statutory aggravating circumstances.

Further, section 16-11-103(8)(b) provides:

> (b) If any death sentence is imposed upon a defendant pursuant to the provisions of this section and the imposition of such death sentence upon such defendant is held invalid or unconstitutional, said defendant shall be returned to the trial court and shall then be sentenced to life imprisonment.

Colorado Appellate Rule 4(e) also provides:

> **Appeals of Cases in Which a Sentence of Death Has Been Imposed. (1) Availability of Review.** Whenever a sentence of death is imposed, the Supreme Court shall review the propriety of the sentence, having regard to the nature of the offense, the character and record of the offender, the public interest, and the manner in which the sentence was imposed, including the sufficiency and accuracy of the information upon which it was based.
>
> If the Supreme Court determines that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, or that, as a matter of law, the sentence is not supported by the evidence, a sentence of death shall not thereafter be imposed.
>
> **(2) Procedure and Conditions.**
>
> (I) The trial court, at the time of imposition of a sentence of death, shall enter an order staying execution of the judgment and sentence until further order of the Supreme Court, and shall direct the clerk of the trial court to mail to the Supreme Court, within seven days of imposition of sentence, a copy of the judgment, sentence, and mittimus.
>
> (II) The record, as described in subsection (3) of this Rule, shall be prepared in the same form as any other record to be

presented to the Supreme Court and shall be transmitted by the clerk of the trial court within forty days of imposition of sentence, or such additional time as may be allowed by the Supreme Court.

(III) Except as provided by subsection (e) of this Rule, the Colorado Appellate Rules governing criminal appeals shall apply to appellate review of sentences.

(3) **Record on Appeal.** In appeals under subsection (e) of this Rule, the following items shall be included in the record on appeal:

(I) The indictment or information upon which the sentence is based; a verbatim transcript of the entire sentencing proceeding; the instructions given by the trial court and tendered by the parties in the sentencing proceeding; all exhibits admitted or offered during the trial and at the sentencing proceeding; all verdict forms submitted to the jury; and the judgment, sentence, and mittimus.

(II) Such other portions of the record as may be designated under C.A.R. 10(b) or as may be ordered by the Supreme Court.

Our extensive review of the record in this case convinces us that the jury properly determined that death was the appropriate penalty. As discussed above, the prosecution proved beyond a reasonable doubt the existence of five statutory aggravators.[51] The defendant's prior criminal record and the other evidence produced at trial demonstrates that defendant's character was such that he presented a continuing risk to society. The mitigators presented by the defendant were properly found insufficient to outweigh the aggravators presented by the prosecution. Further, we find that there is nothing in the record to suggest that the sentence was imposed under the influence of passion or prejudice or any other arbitrary factor.

XIII.

The judgment of the district court finding the defendant guilty is affirmed. The verdict of the jury, that the defendant be sentenced to die from lethal gas, is affirmed. This case is remanded to the district court to set a date for the execution of the sentence.

QUINN, C.J., dissents; LOHR and KIRSHBAUM, JJ., join the dissent in part.

LOHR, J., dissents.

KIRSHBAUM, J., dissents; LOHR, J., joins in the dissent.

Chief Justice QUINN dissenting.

The shocking and repulsive killing of Virginia May creates an instinctive demand for ultimate retribution. Our system of law, however, does not permit justice to be rationed in inverse proportion to the depravity of the crime. Indeed, it is precisely because of the distinctive urge to exact ultimate retribution that there devolves upon this court a correspondingly greater duty to assure itself that the means employed by the state in imposing the death sentence comport with constitutional norms calculated to insure fundamental fairness in a capital sentencing hearing.

A death sentence is qualitatively different from any other sentence. "Death, in its finality, differs more from life imprisonment than a 100–year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion). This requirement of reliability, which is grounded in constitutional doctrine, mandates a "careful scrutiny in the review of any colorable claim of error." *Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). Procedures that might pass constitutional muster in

51. Further, as discussed above, our review of the record leads us to conclude beyond a reasonable doubt that had the heinous, cruel or depraved aggravator properly been narrowed by the trial court, the jury would have found that such aggravator had been proved beyond a reasonable doubt.

other criminal proceedings, or might satisfy even the harmless error standard on review, well may be inadequate when the state imposes the ultimate sanction of death.

An appellate court reviewing a death sentence has the nondelegable responsibility of assuring itself that the decision whether a person deserves to live or die is not made on scales that are tipped in favor of death but rather is based on procedures that minimize the risk of arbitrary and capricious action and enhance the certainty and reliability of the sentencer's decision. The record in this case demonstrates a combination of errors which in the aggregate create an unacceptable risk that the jury's death sentence was imposed in violation of proper constitutional norms. These errors encompass such fundamental components of our legal process as the impermissible disqualification of prospective jurors from the jury panel, several faulty jury instructions that irreparably undermined the reliability of the death verdict, and an unconstitutionally vague aggravating factor submitted to the jury for its consideration in weighing aggravating factors against mitigating factors. Instead of coming to grips with the cumulative effect of these errors on the essential fairness of a capital sentencing hearing, the court employs a cramped analysis of an array of substantive and procedural deficiencies and reduces basic constitutional principles to ineffectual formalities. I accordingly dissent.

I.

A review of the record shows that the trial court improperly excused two jurors from the jury panel because of their views on capital punishment. Although I cannot say that the improper exclusion of these prospective jurors programmed the ultimately selected jury to return a death sentence, I am satisfied that the trial court exceeded the bounds of permissible constitutional discretion in excusing these jurors for cause.

A.

A sentence of death cannot be carried out if the jury that imposed the sentence was chosen by excluding prospective jurors for cause simply because they voiced general objections to the death penalty or expressed some degree of conscientious reluctance to impose it. *Maxwell v. Bishop*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (per curiam). The prohibition against improperly excusing a juror for cause in a capital sentencing proceeding is grounded in the Sixth Amendment right to a fair trial. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The standard for determining whether a prospective juror should be excused for cause because of the juror's views on capital punishment is whether those views would prevent or substantially impair the juror in performing his or her duties in accordance with the instructions on the law and the juror's oath. *Id.* at 420, 105 S.Ct. at 850; *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). A prospective juror's preconceived belief as to the propriety of capital punishment does not alone provide a sufficient basis to disqualify the juror for cause. Rather, the controlling standard is whether the juror is unable to set aside his or her beliefs and render a verdict based upon the evidence adduced at trial and the court's instructions on the law. *People v. Drake*, 748 P.2d 1237, 1243–44 (Colo.1988). The purpose of jury selection, in short, is to empanel jurors who will impartially determine the facts and conscientiously apply the law to those facts, and not to seek jurors who are predisposed to return a verdict of death.

B.

The first juror improperly excused for cause was Thelma Wolfe. The trial court excused Ms. Wolfe because, in the court's view, she manifested some uncertainty as to whether she could or could not make a decision to impose the death penalty in this case.[1] Wolfe initially stated that she did

1. The trial court also ruled that Ms. Wolfe had already formed an opinion on the case, but it

not approve of the death penalty and probably would not vote for it, but later acknowledged that if sworn as a juror she would be able to set aside her personal views on capital punishment. The following colloquy reflects her ability to do so:

Q (By defense counsel): On the jury under oath, even though I know you don't like the death penalty, and you don't believe in the death penalty, if you were under oath and you knew the law in Colorado was that you had to consider the death penalty, and if it were appropriate to return a death verdict, would you follow that oath?

A: I would have to, I suppose.

Q: You wouldn't like it?

A: No, I certainly wouldn't.

Q: But you would do it?

A: I would have to, yes, if I took the oath.

The interrogation of Wolfe clearly shows that she voiced general objections to the death penalty and had some reluctance to consider it but that nonetheless she would be able to abide by her oath as a juror and to render a verdict in accordance with the law and the evidence.

C.

The other juror improperly excused for cause was Michael Bradbury. He initially stated that he had some problems with the death penalty, but he never suggested that he would be unable to vote for it under any and all circumstances, as the majority seems to suggest. On the contrary, this prospective juror acknowledged that he could impartially determine whether the district attorney had proven beyond a reasonable doubt the presence of aggravating factors, could decide whether mitigating factors existed, and could follow his oath in determining whether certain facts existed that might render the death penalty appropriate. When questioned on whether he could vote for the death penalty, Bradbury at one point responded that it would depend on the circumstances. When questioned again, he responded that he didn't know, and at one point responded that he could not vote for the death penalty. When the prosecutor challenged Bradbury for cause, the trial court posed this additional question:

Q: Well, Mr. Bradbury, you have gone down this line where you have found the aggravating factors, they outweigh the mitigating factors; that means that under the law that you would have to find the death penalty. Are you saying that under those circumstances, that even though logically that would be the conclusion, that you would not follow it?

Mr. Bradbury's response indicated that, based on the circumstances posed by the court, he would be unable to vote for the death penalty. However, the question asked by the court, as the majority concedes, contained an inaccurate statement of the law. It is not correct that under Colorado law a finding that aggravating factors outweigh mitigating factors mandates a death sentence. Rather, it is incumbent upon a juror, after being convinced beyond a reasonable doubt that mitigating factors do not outweigh proven aggravating factors, to further determine whether death is the appropriate sentence in the particular case under consideration. *People v. Tenneson,* 788 P.2d 786 (Colo.1990).

Notwithstanding the inaccurate statement of the law contained in the trial court's question, the majority nonetheless concludes that the question was appropriate for determining whether the prospective juror was "inalterably opposed to capital punishment." Maj. op. at 207. Bradbury's answer, which caused the trial court to excuse him for cause, indicated only that he would not vote for the death penalty based solely on a simple weighing of mitigators and aggravators. Bradbury's voir dire examination, considered in its totality, indicates that he viewed his task with the utmost seriousness and gravity and that he could consider the death penalty but most likely would not vote for it. In the absence

was clearly shown during her voir dire examination that she had confused the instant case with another. There thus was no basis at all to excuse Ms. Wolfe for cause on this alternative basis relied on by the trial court.

of a more convincing demonstration than that present here of Bradbury's categorical opposition to capital punishment and his inability to consider the death penalty as a possible penalty in any case whatever, I would hold that, considering the voir dire examination of this juror in its entirety, the trial court's disqualification of Bradbury was premature. Although Bradbury expressed some objection to the death penalty and a reluctance to impose it, I do not view his total examination as demonstrating such an irrevocable opposition to capital punishment as would have prevented or substantially impaired him from performing his duty as a juror and from returning a verdict according to the law and the evidence and in a manner consistent with his oath as a juror.

In my view, therefore, the trial court's rulings in excluding for cause Ms. Wolfe and Mr. Bradbury violated the defendant's right to a fair and impartial jury on the issue of life or death, with the result that the death sentence imposed by the empaneled jury did not comport with constitutional norms. *Maxwell*, 398 U.S. 262, 90 S.Ct. 1578.

II.

The trial court gave several jury instructions that, when considered in the context of other deficiencies in the sentencing phase of the trial, substantially detracted from the constitutionally required reliability and certainty essential to a valid death verdict.

A.

In *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the United States Supreme Court vacated a death sentence because the jury instructions and the verdict form reasonably could have been understood by the jury to preclude consideration of any mitigating evidence unless all twelve jurors agreed on the existence of a particular mitigating circumstance. After noting that the critical question is not what the Maryland Court of Appeals declared "the meaning of the jury charge to be, but rather what a reasonable juror could have understood the charge as meaning," *id.* at 376, 108 S.Ct. at 1866 (quoting *Francis v. Franklin*, 471 U.S. 307, 315–16, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985)), the Court stated:

> With respect to findings of guilt on criminal charges, the Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. *See, e.g., Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (1957); *Stromberg v. California*, 283 U.S. 359, 367–368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931). In reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds. *See, e.g., Lockett v. Ohio*, 438 U.S. at 605, 98 S.Ct. at 2965 ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"); *Andres v. United States*, 333 U.S. 740, 752 [68 S.Ct. 880, 886, 92 L.Ed. 1055] (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning of § 567 [federal statute authorizing jury to qualify guilty verdict by adding thereto "without capital punishment"] is probable. In death cases doubts such as those presented here should be resolved in favor of the accused"); accord, *Zant v. Stephens*, 462 U.S. 862, 884–885 [103 S.Ct. 2733, 2746–47, 77 L.Ed.2d 235] (1983). Unless we can rule out the substantial possibility that the jury may have rested its verdict on the "improper" ground, we must remand for resentencing.
>
> * * * * * *
>
> We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have

thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

486 U.S. at 376–77, 384, 108 S.Ct. at 1866–67, 1870 (footnotes omitted); *accord, McKoy v. North Carolina,* — U.S. —, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

Here, the trial court instructed the jury, in pertinent part, that "if ... *you have made unanimous findings* that the prosecution has proven beyond a reasonable doubt that one or more aggravating factors exist and that no mitigating factors exist, or *that a mitigating factor or factors exists,* you must now decide whether the prosecution has proven that any factors in aggravation outweigh any factors in mitigation." (Emphasis added). The majority rejects the defendant's argument that this instruction (Instruction No. 5) reasonably could have been interpreted by the jury as requiring unanimity on a mitigating factor because, according to the majority, the instruction further informed the jury that if "one or more of the jurors believe that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury should enter a verdict of life imprisonment." Maj. op. at 194. Although this latter portion of the instruction could be interpreted as negating any requirement of unanimity on a mitigating factor, the instruction can also reasonably be read as internally inconsistent or, more importantly, as negating the unanimity requirement only as to the "outweighing" requirement but not as to the existence of a particular mitigating factor. If read in either way, the requirement of reliability essential to a valid death verdict would be irreparably impaired because reasonable jurors well might have believed that they were precluded from considering any mitigating factor unless all twelve jurors agreed on the existence of the particular mitigating factor. In light of the high requirement of reliability for the determination that death is the appropriate penalty in a particular case, a doubt such as that present here must be resolved in favor of the accused. *E.g., McKoy,* — U.S. —, 110 S.Ct. 1227; *Mills,* 486 U.S. 367, 108 S.Ct. 1860.

B.

The high standard of reliability and certainty applicable to a capital sentencing hearing also mandates that the jury not be led to believe that the responsibility for determining the ultimate appropriateness of a death sentence rests elsewhere. In *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the United States Supreme Court vacated a death sentence because the prosecutor's summation led the jury to believe that responsibility for determining the appropriateness of the death sentence rested not with the jury but with an appellate court which would later review the case. The Court stated:

> This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated.

*Id.* at 341, 105 S.Ct. at 2646.

It is of no significance that a particular infirmity in the constitutional requirement of reliability originates in a jury instruction rather than, as in *Caldwell,* in a prosecutor's summation. *See Mills,* 486 U.S. at 376, 108 S.Ct. at 1866. What is significant is that an instruction that leaves the jury in a state of uncertainty or confusion about the effect of their verdict on the ultimate question of life imprisonment or death is incompatible with the reliability required for a valid death sentence. *E.g., Drake,*

748 P.2d 1237 (death sentence reversed where jury instructions did not clearly and unambiguously apprise jury of their role "as the sole arbiter of whether a sentence of death should be imposed upon the defendant"); *People v. Durre,* 690 P.2d 165 (Colo.1984) (death sentence reversed where jury verdict manifested some uncertainty as to whether all jurors had unanimously agreed to death sentence and where instructions on aggravating and mitigating circumstances did not adequately inform jury of effect of verdict on ultimate question of life imprisonment or death).

In this case, the trial court submitted an instruction which stated that "for purposes of sentencing" the crimes of murder in the first degree after deliberation and felony murder merge, that "the defendant would receive a life sentence on these counts," and that "[t]he decision whether to impose concurrent or consecutive life sentences is upon the court." The majority holds that the obvious effect of this instruction (Instruction No. 10) was to inform the jurors that "they should assume, as a starting point, that the least severe penalty the defendant was to receive was two life sentences." Maj. op. at 196. From that unsupported premise the majority concludes that the instruction "could not possibly have detracted from the clear understanding of the jury that despite those life sentences, if the jury ultimately determined that death was the appropriate sanction, then the defendant would be put to death." *Id.* at 196. The majority's conclusion flies in the face of the unambiguous language of the instruction itself. By its plain terms, the instruction created the potential for jury confusion on whether the jury verdicts were advisory only or indeed were final and binding decisions on the ultimate issue of life imprisonment or death.[2]

C.

The above errors were compounded, in my view, by the court's instruction on the "reasonable doubt" standard of proof applicable to the jury's weighing of mitigating factors against any proven aggravating factors. The jury was instructed that the prosecution must prove beyond a reasonable doubt that "[n]o mitigating factor or factors outweigh the aggravating factor or factors found to exist beyond a reasonable doubt." Although this instruction (Instruction No. 2) was consistent with this court's recent decision in *People v. Tenneson,* 788 P.2d 786, I continue to adhere to my dissenting view in *Tenneson* that the formulation of the "proof beyond a reasonable doubt" standard in terms of mitigating factors not outweighing aggravating factors vitiates the reliability essential to a capital sentencing hearing.[3]

Such formulation permits the jury to consider the imposition of a death sentence notwithstanding the fact that the jury finds that the mitigating factors are evenly balanced with any proven aggravating factors. A death sentence predicated on a state of evidentiary equipoise of mitigation and aggravation "is irreconcilable with the heightened reliability and concomitant certainty required for a constitutionally valid death verdict." *Tenneson,* 788 P.2d at 805 (Quinn, C.J., dissenting). The Supreme Court of New Jersey cogently and succinctly articulated the fundamental flaw in the instruction under consideration here:

2. This instruction (Instruction No. 10) was also in direct conflict with another instruction which told jurors that they must "decide whether the defendant should be sentenced to death or life imprisonment" and that they "must assume that the penalty of death will be carried out if [they] impose it." The inconsistency between this instruction and the other instruction served only *to highlight the confusion and uncertainty with* respect to whether it was the jury or the court which had the ultimate responsibility for determining the appropriateness of the sentence in this case.

3. Although Instruction No. 2, given in this case, comports with *Tenneson,* other instructions given by the court, namely Instructions No. 5 and No. 7, directing the jury to weigh mitigating factors against aggravating factors did not expressly require that the jury's determination regarding mitigators not outweighing aggravators be beyond a reasonable doubt. These latter instructions do not comport with *Tenneson* and only add to the constitutional infirmities existing at the penalty phase.

> We speak here about the ultimate value judgment, the ultimate question of life or death, for while the formulation is in terms of "beyond a reasonable doubt," and therefore appropriately applicable to factfinding, the weighing process really is not factfinding at all but a judgmental determination by the jury, based on conflicting values, of whether the defendant should live or die. *See Barclay v. Florida,* 463 U.S. 939, 950, 103 S.Ct. 3418, 3425, 77 L.Ed.2d 1134, 1144 (1983) (plurality opinion) ("It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing."). If anywhere in the criminal law a defendant is entitled to the benefit of the doubt, it is here. We therefore hold that as a matter of fundamental fairness the jury must find that aggravating factors outweigh mitigating factors, and this balance must be found beyond a reasonable doubt.

*State v. Biegenwald,* 106 N.J. 13, 524 A.2d 130, 156 (1987).

Furthermore, the trial court's formulation of the reasonable doubt standard in terms of mitigating factors not outweighing aggravating factors has the practical effect of creating "a burden-shifting presumption of death eligibility upon the state's proof of an aggravating factor beyond a reasonable doubt." *Tenneson,* 788 P.2d at 806 (Quinn, C.J., dissenting). "Presumptions which have the effect of shifting the burden of persuasion to an accused have been struck down as violative of due process of law under both the United States and Colorado constitutions." *Id.; see, e.g., Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Jolly v. People,* 742 P.2d 891 (Colo.1987). I cannot reconcile such a presumption with the constitutional prohibition against cruel and unusual punishment under federal and state constitutional doctrine or, for that matter, with the most rudimentary requirements of due process of law. *See Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988) (Arizona statutory scheme requiring imposition of death sentence when one or more aggravating circumstances exist and "there are no mitigating circumstances sufficiently substantial to call for leniency" violates Eighth Amendment by creating a presumption of death and unduly limiting consideration of mitigating factors); *Jackson v. Dugger,* 837 F.2d 1469 (11th Cir.1988) (finding unconstitutional a jury instruction which stated that death should be presumed as the appropriate penalty unless mitigating circumstances outweigh proven aggravating circumstances) *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988).

III.

Rather than construing and applying Colorado's death penalty scheme in a narrow fashion, the trial court erroneously expanded an aggravating factor beyond its intended scope and erroneously permitted the jury to consider a single aggravating factor twice in the weighing process.

A.

To be consistent with Eighth Amendment jurisprudence, a capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sanction on the defendant compared to others found guilty of murder." *Stephens,* 462 U.S. at 877, 103 S.Ct. at 2742; *see Tenneson,* 788 P.2d at 790. Indeed, the very reason for codifying into law a list of aggravating circumstances is to satisfy this constitutional requirement by narrowing the class of persons eligible for the death penalty according to an objective legislative definition. *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988).

Because the defendant at the time he kidnapped and murdered the victim was on parole for first degree sexual assault, a class three felony, § 18–3–402, 8B C.R.S. (1986), the trial court instructed the jury on the aggravating factor listed in subsection 16–11–103(6)(a), 8A C.R.S. (1986)—that is, "[t]he class 1 felony was committed by a person under sentence of imprisonment for

a class 1, 2, or 3 felony as defined by Colorado law." The trial court further instructed the jury that a "person on felony parole is by law deemed to be still under sentence of imprisonment for the felony that caused him originally to be sentenced." The majority concludes that principles of statutory construction support the trial court's submission of this statutory aggravating factor to the jury. Maj. op. at 180–182. In my view, the majority construes this provision not only in derogation of the constitutional requirement of narrowing the class of persons eligible for the death sentence but also in a manner contrary to basic rules of statutory construction.

I acknowledge that the phrase "under sentence of imprisonment" in section 16–11–103(6)(a) is perhaps unclear and thus susceptible to more than one meaning. Under such circumstances, it is appropriate to look to legislative history in an effort to effectuate legislative intent. In looking to the legislative history, the majority concedes that the term "under sentence of imprisonment" was intended to "cover persons who are in prison at the time they commit the class 1 felony." Maj. op. at 181. The majority, however, does not end its inquiry here. Instead, the majority, asserting that this may not have been the sole purpose of the statutory aggravator, hypothesizes that another purpose was to provide a deterrent effect to persons on parole who, as a class, "pose a greater threat of criminal activity to law enforcement authorities than ordinary citizens." Maj. op. at 182 (quoting *People v. Anderson,* 189 Colo. 34, 37, 536 P.2d 302, 304 (1975)). This unsupported assumption, however, is without foundation in either the text or legislative history of the statutory aggravator under consideration and actually results in broadening the class of death eligible persons.

It is inconceivable to me that the General Assembly intended the term "under sentence of imprisonment" to include persons on parole but was somehow at a loss to express its intent. As an ostensible rationale for its construction of "under sentence of imprisonment," the majority relies on the 1988 amendment to section 16–11–103(6)(a), which broadens the statutory aggravator to include the following: "The class 1 felony was committed by a person under sentence of imprisonment *including the period of parole, or on probation,* for a class 1, 2, or 3 felony as defined by Colorado law." Ch. 114, sec. 1, § 16–11–103(6)(a), 1988 Colo.Sess.Laws 673, 674. (Emphasis added). The significance of the 1988 amendment lies in the fact that it quite clearly demonstrates that the General Assembly intended to change the preexisting law by broadening its scope to include the period of parole or probation. *See Charnes v. Lobato,* 743 P.2d 27, 30 (Colo.1987); *People v. Hale,* 654 P.2d 849, 851–52 (Colo.1982).

At the very least, the statutory term "under sentence of imprisonment" is ambiguous. Under such circumstances, the rule of lenity requires that the statute be strictly construed in favor of the accused. *Bell v. United States,* 349 U.S. 81, 83, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955); *Tenneson,* 788 P.2d at 795; *S.G.W. v. People,* 752 P.2d 86, 88 (Colo.1988); *People v. Russo,* 713 P.2d 356, 364 (Colo.1986); *Chavez v. People,* 659 P.2d 1381, 1384 (Colo.1983); *People v. Lowe,* 660 P.2d 1261, 1267–68 (Colo.1983); *People v. Cornelison,* 192 Colo. 337, 559 P.2d 1102 (1977). The majority ignores the rule of lenity and adopts a construction inconsistent with the constitutionally mandated "narrowing" requirement applicable to capital sentencing statutory schemes.

B.

To permit the jury to consider and weigh the same aggravating circumstance twice during the course of a capital sentencing results in artificially inflating the particular circumstances of the crime and strays from the constitutional mandate that a state "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433, 449 (1984) (quoting *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980)). The "dou-

bling up" effect or the duplicate use of the same aggravating factor for essentially the same purpose runs afoul of the constitutional requirement that a capital sentencing scheme guide and focus the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender in determining whether a death sentence is the appropriate punishment in a particular case. *See Jurek v. Texas,* 428 U.S. 262, 273–74, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976); *Cook v. State,* 369 So.2d 1251, 1256 (Ala.1979); *Randolph v. State,* 463 So.2d 186, 193 (Fla.1984); *Francois v. State,* 407 So.2d 885, 891 (Fla. 1982), *cert. denied,* 458 U.S. 1122, 102 S.Ct. 3511, 73 L.Ed.2d 1384 (1982); *Provence v. State,* 337 So.2d 783, 786 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977); *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874 (1977); *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569, 587 (1979).

The trial court in this case submitted to the jury the "kidnapping" statutory aggravator listed in subsection 16–11–103(6)(d), 8A C.R.S. (1986)—that the defendant "intentionally killed a person kidnapped or being held as a hostage by him or by anyone associated with him"—and also the felony-murder aggravator codified in section 16–11–103(6)(g), 8A C.R.S. (1986)—that the defendant committed "a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants." Because the "kidnapping-killing" formed the basis of both statutory aggravators, the trial court's submission of both aggravators to the jury impermissibly allowed the jury to weigh and consider the single aggravating circumstance of the "kidnapping-killing" twice for essentially the very same purpose in determining the issue of life or death. The majority, however, concludes that the doubling up of aggravators "is not legally significant" because the jury was instructed that it is the weight assigned to each aggravating factor, rather than the number of aggravating factors, that is to be considered. Maj. op. at 189. This analysis does not adequately answer the "doubling up" problem. Permitting the jury to consider two aggravating factors for essentially the same purpose increases the likelihood that the jury will attribute greater weight to the proven aggravating factors in the weighing process and correspondingly reduces the likelihood that the jury will find that no mitigating factors outweigh the proven aggravating factors. The duplicate use of the same aggravator for essentially the same purpose, as the jury was permitted to do in this case, fosters the very type of arbitrary and capricious decision-making that is constitutionally prohibited in a capital sentencing proceeding.[4]

IV.

Of the many errors in the case, perhaps the most predominant is the trial court's submission to the jury of the statutory aggravating factor that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner." § 16–11–103(6)(j), 8A C.R.S. (1986). Although such statutory aggravator was declared unconstitutionally vague by the United States Supreme Court in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the majority, enigmatically in my view, finds no reversible error in this case.

4. Although the majority relies on *People v. Melton,* 44 Cal.3d 713, 244 Cal.Rptr. 867, 750 P.2d 741 (1988), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988) and *State v. Clark,* 108 N.M. 288, 772 P.2d 322 (1989), *cert. denied,* — U.S. —, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989), for the proposition that doubling up aggravators is constitutionally permissible, I do not read those cases to support the proposition advocated by the majority. In both cases, no actual overlapping of aggravating factors occurred. *Melton* involved a robbery, which consisted of an assault against the personal security of the victim, and a burglary, which involved invasion of a home. So also, in *Clark,* the aggravating circumstance of "murder in the commission of kidnapping" did not necessarily involve the aggravating factor of the "murder of a witness." In contrast to both *Melton* and *Clark,* the tragic circumstances involving the kidnapping and killing of Virginia May were improperly considered and weighed twice by the jury for the very same purpose.

A.

After noting that the United States Supreme Court in *Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, held that the statutory aggravator of "especially heinous, atrocious, or cruel" was unconstitutionally vague and thus contrary to the Eighth Amendment's prohibition against standardless and open-ended discretion in the imposition of a death sentence, the majority concludes that the error in submitting this unconstitutionally vague aggravator was harmless beyond a reasonable doubt. Maj. op. at 177–180. The majority reaches this astounding conclusion by engrafting onto the statutory aggravator a so-called narrowing construction derived from the Supreme Court's decision in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (Stewart, Powell, and Stevens, J.J.), which upheld a Florida aggravator of "especially heinous, atrocious, or cruel" on the basis of the Florida Supreme Court's construction limiting the aggravator to murders which are "conscienceless or pitiless" and "unnecessarily torturous to the victim." Maj. op. at 176.

The *Proffitt* interpretative gloss on the meaning of "especially heinous, cruel, or depraved" was never brought to the attention of the jury in this case. Nevertheless, according to the majority, if the trial court had properly limited the unconstitutionally vague terms to include only those murders which were conscienceless or pitiless, and were unnecessarily torturous to the victim, the jury under the facts of this case would have returned a verdict of death. Maj. op. at 179–180. Such a conclusion, reduced to its essentials, is nothing but a facile guess at what the jury would have found under a totally hypothetical set of instructions that realistically could not possibly have been within the contemplation of any juror when this case was decided.

It is important to note that the prosecutor did not make a mere passing reference to the heinous, cruel, and depraved manner in which the murder was committed. Rather, the prosecutor presented the jury with a vivid description of the way in which the killing satisfied each of these three characteristics. I recognize that the United States Supreme Court in *Clemons v. Mississippi,* — U.S. —, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), held that there is no federal constitutional impediment to an appellate court's affirmance of a death sentence in a "weighing state" where the jury is instructed on an unconstitutional statutory aggravator. However, the Court in *Clemons* specially noted that nothing in its decision was intended "to convey the impression that state appellate courts are required to or necessarily should engage in reweighing or harmless error analysis when errors have occurred in a capital sentencing proceeding." — U.S. at —, 110 S.Ct. at 1451. To say that an appellate court is not prohibited from indulging in such a procedure, therefore, is certainly not to affirm that the prudent course for an appellate court is to endorse such a procedure.

In reweighing the facts, this court transforms its traditional function of appellate review of a trial record for error of law into a role of appellate factfinding. Justice Blackmun spoke to the fallacy of such an approach in his dissent in *Clemons:*

> If a jury's verdict rests in part upon a constitutionally impermissible aggravating factor, and the State's appellate court upholds the death sentence based upon its own reweighing of legitimate aggravating and mitigating circumstances, the appellate court, in any real sense, has not approved or affirmed the verdict of the jury. Rather, the reviewing court in that situation has assumed for itself the role of sentencer. The logical implication of the majority's approach is that no trial-level sentencing procedure need be conducted at all. Instead, the record of a capital trial (including a sentencing hearing conducted before a court reporter) might as well be shipped to the appellate court, which then would determine the appropriate sentence in the first instance.
>
> * * * * * *
>
> In part, therefore, the impropriety of appellate sentencing rests on the appellate court's diminished ability to act as a factfinder. But I think there is more to

it than that. An appellate court is ill-suited to undertake the task of capital sentencing, not simply because of its general deficiencies as a factfinder, or because the costs of erroneous factfinding are so high, but also because the capital sentencing decision by its very nature is peculiarly likely to turn on considerations that cannot adequately be conveyed through the medium of a written record.

*Id.* at ——-——, ——, 110 S.Ct. at 1456, 1460 (Blackmun, J. dissenting). We have adhered to this salutary principle of not reweighing evidence on appeal merely because we might have reached a conclusion different from that drawn by the jury if we had served as jurors in the case under review. *E.g., Godfrey v. People,* 168 Colo. 299, 451 P.2d 291 (1969); *Cokley v. People,* 168 Colo. 52, 449 P.2d 824 (1969); *Neighbors v. People,* 161 Colo. 587, 423 P.2d 838 (1967); *Balltrip v. People,* 157 Colo. 108, 401 P.2d 259 (1965); *Mitchell v. People,* 24 Colo. 532, 52 P. 671 (1898). Today's decision, unfortunately, abandons this longstanding principle of Colorado jurisprudence.

B.

Because mistakes inevitably will occur in the course of a trial, an appellate court is directed to disregard errors not affecting a substantial right of an accused. C.A.R. 35(e). The proper inquiry in determining a harmless-error question is not whether there was sufficient evidence to support the verdict without the asserted error, but rather whether the error substantially influenced the verdict or affected the fairness of the trial proceedings. *E.g., Kotteakos v. United States,* 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946); *People v. Gaffney,* 769 P.2d 1081, 1088 (Colo.1989); *Tevlin v. People,* 715 P.2d 338, 342 (Colo.1986); *People v. Quintana,* 665 P.2d 605, 612 (Colo.1983). Only if a reviewing court can find with fair assurance, in light of the entire record of the trial, that the error did not substantially influence the verdict or impair the fairness of the trial, may the court deem the error harmless. *E.g., Kotteakos,* 328 U.S. at 764-65, 66 S.Ct. at 1247-48; *Gaffney,* 769 P.2d at 1088; *Tevlin,* 715 P.2d at 342; *Quintana,* 665 P.2d at 612. Where, as here, the error is of a constitutional character, a reviewing court must be satisfied that the error is harmless beyond a reasonable doubt before the error properly can be categorized as harmless. *E.g., Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Germany v. People,* 198 Colo. 337, 599 P.2d 904 (1979).

If the failure of a trial court to instruct a jury on an essential element of a crime constitutes plain error affecting the substantial rights of the defendant, *see, e.g., Ramirez v. People,* 682 P.2d 1181 (Colo. 1984); *People v. Hardin,* 199 Colo. 229, 607 P.2d 1291 (1980); *People v. Archuleta,* 180 Colo. 156, 503 P.2d 346 (1972), I am at a total loss to understand how the trial court's instruction on an unconstitutionally vague statutory aggravator, especially when viewed in connection with several other errors of record, can be deemed harmless constitutional error. In light of Colorado's statutory scheme requiring the jury to be convinced beyond a reasonable doubt that any mitigating factors do not outweigh a proven statutory aggravating factor, and the further requirement that the jury, after weighing the aggravating and mitigating factors, must agree unanimously and beyond a reasonable doubt that death is the appropriate penalty, *see Tenneson,* 788 P.2d 786, I cannot say with any degree of assurance, much less beyond a reasonable doubt, that the error in submitting the unconstitutionally vague aggravating factor to the jury did not adversely and substantially influence the verdict or impair the basic fairness of the capital sentencing hearing.

V.

Numerous irregularities, each one of which in itself might not justify reversal, may in the aggregate so affect the substantial rights of an accused as to require reversal. *E.g., People v. Botham,* 629 P.2d 589 (Colo.1981); *People v. Lucero,* 200

Colo. 335, 615 P.2d 660 (1980); *People v. Reynolds,* 194 Colo. 543, 575 P.2d 1286 (1978); *Oaks v. People,* 150 Colo. 64, 371 P.2d 443 (1962). The errors in this case include the following: the impermissible disqualification of two jurors whose views on capital punishment would not have prevented or substantially impaired them in the performance of their duty to apply the law to the facts of the case in a conscientious and impartial manner, *Wainwright,* 469 U.S. 412, 105 S.Ct. 844; *Maxwell,* 398 U.S. 262, 90 S.Ct. 1578; the submission of a jury instruction that reasonably could have been understood by the jury to preclude consideration of any mitigating evidence unless all twelve jurors agreed to the existence of a particular mitigating circumstance, *Mills,* 486 U.S. 367, 108 S.Ct. 1860; the submission of another jury instruction that had the capacity to confuse the jury on whether the ultimate responsibility for determining the appropriateness of the death sentence rested with the court or with the jury, *Caldwell,* 472 U.S. 320, 105 S.Ct. 2633; the submission of a third instruction that, at least in my view, formulated the reasonable doubt standard in terms of mitigation not outweighing aggravation in contravention of the basic requirement of reliability for a death verdict mandated by the Cruel and Unusual Punishment Clauses of the United States and Colorado Constitutions, U.S. Const.Amend. VIII; Colo. Const. art. II, § 20, and in contravention of the prohibition against a burden-shifting presumption of death upon the prosecution's proof of an aggravating factor in violation of the Cruel and Unusual Punishment and Due Process Clauses of the United States and Colorado Constitutions, U.S. Const. Amends. VIII and XIV; Colo. Const. art. II, §§ 20 and 25; the erroneous submission of a statutory aggravator by construing and applying it in a manner that broadened rather than genuinely narrowed the class of persons eligible for the death penalty, *Stephens,* 462 U.S. 862, 103 S.Ct. 2733; the submission of a single aggravating circumstance under two separate statutory aggravators, with the result that the jury considered and weighed the same aggravating circumstances twice for the same purpose, *Harris,* 679 P.2d 433; and the submission of an unconstitutionally vague aggravating factor to the jury for its consideration on the question of life or death, *Cartwright,* 486 U.S. 356, 108 S.Ct. 1853; *Godfrey,* 446 U.S. 420, 100 S.Ct. 1759.

Regrettably, these errors did not end with the termination of the capital sentencing hearing. In resolving this case, the majority employs a form of analysis that is irreconcilable with the strict scrutiny required in the judicial review of a death sentence. I find nothing in today's decision that contributes to the law's effort to develop a system of capital punishment that is both consistent and principled, that genuinely narrows the class of persons eligible for the death sentence, and that provides procedures calculated to achieve a high degree of reliability and certainty in the jury's determination that death is the appropriate sentence in a particular case.

It well may be that Gary Lee Davis is deserving of execution in retribution for his crimes. That life-or-death decision, however, should be the result of a fundamentally fair proceeding and not, as here, the product of an irreparably flawed process replete with substantive and procedural infirmities that cannot withstand constitutional scrutiny under a reasonably objective analysis. I would vacate the death sentence in this case.

I am authorized to say that Justice LOHR and Justice KIRSHBAUM join the dissent in part.

Justice LOHR dissenting:

The unique severity and finality of the death penalty require a heightened level of reliability and certainty in capital sentencing. *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988); *Lowenfield v. Phelps,* 484 U.S. 231, 238–39, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978); *People v. Tenneson,* 788 P.2d 786, 791 (Colo.1990). In *Tenneson,* we held that Colorado's death sentencing statute should be construed in light of this strong concern for reliability and certainty. *Tenneson,* at 792.

The Colorado death penalty statute, § 16–11–103, 8A C.R.S. (1986), establishes a four-step process for jury deliberation in the penalty phase. First, the jury must determine whether the prosecution has proven the existence of at least one statutory aggravating factor beyond a reasonable doubt. §§ 16–11–103(2)(a)(I), –(6). Second, if the jury finds that at least one statutory aggravating factor exists, the jury must then consider whether any mitigating factors exist. § 16–11–103(2)(a)(II), –(5). Third, the jurors must determine whether the prosecution has convinced them beyond a reasonable doubt that any mitigating factors do not outweigh the statutory aggravating factor or factors previously found to exist. *Tenneson,* at 795. Fourth, and finally, if the jury finds beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors, the jurors must then decide whether the prosecution has convinced each of them beyond a reasonable doubt that the defendant should be sentenced to death. *Id.* at 796.

Because I believe that the jury instructions given in the penalty phase of Gary Lee Davis's trial contained numerous errors, affecting the jury deliberations at several stages, I respectfully dissent. I join in parts II(A) and (B), IV, and much of what is said in parts III [1] and V [2] of Chief Justice Quinn's dissenting opinion, but write separately to express my views more fully and to dissent on further grounds.

I.

Penalty phase instruction no. 3 presented three erroneous aggravators to the jury: the especially heinous, cruel or depraved aggravator, the under sentence of imprisonment aggravator, and the felony murder aggravator.

A.

The trial court submitted to the jury the statutory aggravating factor that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner." *See* § 16–11–103(6)(j), 8A C.R.S. (1986). The majority acknowledges that this statutory aggravator is unconstitutionally vague under the United States Supreme Court's holding in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), but concludes that its erroneous submission to the jury was harmless beyond a reasonable doubt. Maj. op. at 176–180. The majority concludes that the jury would have returned a death sentence if it had been given an especially heinous, cruel or depraved aggravator instruction that incorporated constitutionally-sufficient narrowing definitions of those terms. Maj. op. at 180. I agree with Chief Justice Quinn that such a conclusion is no more than a guess as to what the jury might have decided had it been properly instructed.

Although the United States Supreme Court has held that it is permissible under the federal constitution for a state appellate court to uphold a death sentence in a case such as this by applying a harmless error analysis, *Clemons v. Mississippi,* — U.S. —, —, 110 S.Ct. 1441, 1456, 108 L.Ed.2d 725 (1990), such an approach is inconsistent with Colorado's statutory scheme. In Colorado, the jury is responsible for weighing aggravators and mitigators. Its decision is not merely advisory as it is in some other states. *E.g.,* Fla.Stat. Ann. § 921.141(2) (1985). The Colorado legislature did not contemplate that appellate courts would weigh reformulated aggravating factors against mitigating factors to determine whether a properly instructed jury would have concluded that the death sentence was appropriate. The jury that hears the testimony and views the witnesses is uniquely able to make the difficult moral judgments required in weighing aggravating and mitigating factors and determining whether the death sentence is warranted.

Furthermore, I agree with Chief Justice Quinn that harmless error analysis in this

1. *See* n. 3, below.

2. Part V of Chief Justice Quinn's dissenting opinion relies in some measure on parts I, II(C) and an argument in part III that I do not join.

case requires a finding beyond a reasonable doubt that the error did not substantially influence the verdict or affect the fairness of the proceedings. I am unable to conclude beyond a reasonable doubt that the jurors were unaffected by the erroneous instruction.

B.

Because at the time of the murder Davis was on parole for first degree sexual assault, the trial court instructed the jury on the aggravating factor that "[t]he class 1 felony was committed by *a person under sentence of imprisonment* for a class 1, 2 or 3 felony as defined by Colorado law." *See* § 16–11–103(6)(a), 8A C.R.S. (1986) (emphasis added). I am unpersuaded by the majority's contention that this aggravator was intended to include persons on parole.

Our interpretation of criminal statutes is guided by several principles. Three are of particular relevance here. First, when a penal code statute is ambiguous, a court should interpret it in light of the principle of lenity, which requires the court to adopt the construction that favors the defendant. *People v. Lowe,* 660 P.2d 1261, 1267 (Colo. 1983). Second, the court should look to the legislative history in an effort to determine the legislative intent. *Civil Rights Comm'n v. North Washington Fire Protection Dist.,* 772 P.2d 70, 78 (Colo.1989). I agree with Chief Justice Quinn that the legislative history surrounding section 16–11–103(6)(a) demonstrates the legislature's intent to cover persons in prison and that the legislature's subsequent expansion of this aggravator indicates a legislative desire to change the preexisting law. Third, the court should construe the statute in light of its purpose. *Olinyk v. People,* 642 P.2d 490, 494 (Colo.1982). Although the majority acknowledges that one of the purposes for this aggravator was to provide an additional deterrent for persons already in prison, the majority contends that this aggravator was also intended to provide further deterrence for persons on parole who, by their previous criminal activity, have demonstrated that they are insufficiently deterred by penal sentences. Maj. op. at 181–182. The majority is unable to point to support for this contention in the legislative history. Furthermore, this purpose is more properly viewed as the motivating force behind the statutory aggravator of prior felony convictions. *See* § 16–11–103(6)(b).[3]

C.

The trial court submitted both the kidnapping statutory aggravator, § 16–11–103(6)(d), and the felony murder aggravator, § 16–11–103(6)(g), to the jury. Because the kidnapping conviction is the predicate felony for the felony murder aggravator,[4] the submission of both of these aggravators to the jury amounted to unconstitutional double-counting of a single aspect of the crime. I agree with Chief Justice Quinn that by presenting the same aggravating circumstance to the jury twice, the instructions artificially inflated the importance of that single factor and undermined the constitutional requirement that a capital sentencing law must be tailored and applied to avoid the arbitrary and capricious infliction of the death penalty. The majority argues that because the jury was instructed that the weight of each factor rather than the number of factors

3. Chief Justice Quinn would hold that the majority's construction of § 16–11–103(6)(a) is "in derogation of the constitutional requirement of narrowing the class of persons eligible for the death sentence." Quinn, C.J., dissenting, slip op. at 220. I would not reach this issue and do not join in that view expressed in part III of the Chief Justice's dissenting opinion.

4. The verdict form specifies that second-degree kidnapping is the predicate felony for this aggravator. In the prosecutor's closing argument, however, he asserted that there were three predicates to the felony murder aggravator: second-degree kidnapping, conspiracy to commit first-degree murder, and conspiracy to commit second-degree kidnapping. Because the party to an agreement to kill aggravator, § 16–11–103(6)(e), was also submitted to the jury, a felony-murder aggravator that had conspiracy to murder as its predicate would double-count a single aspect of the defendant's crime.

Although the majority opinion states that Davis raped and sexually assaulted the victim, Davis was never charged with or convicted of these crimes.

was important, the double-counting was of no legal significance. This ignores the likelihood that jurors are in fact influenced by the number of aggravators presented as well as the weight they assign to those factors.[5] Courts in several states have found such double-counting to be impermissible despite statutory schemes that theoretically make the number of aggravating factors legally irrelevant. *Cook v. State,* 369 So.2d 1251, 1256 (Ala.1979); *People v. Harris,* 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433, 449 (1984); *Provence v. State,* 337 So.2d 783, 786 (Fla.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977); *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874, *cert. denied,* 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198 (1977); *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569, 587 (1979); *State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264, 296–97 (1984).

II.

The federal constitution requires capital sentencing statutes to permit the sentencing body to consider any relevant mitigating circumstances regarding the defendant's character and background, and the circumstances of the offense. *Boyde v. California,* — U.S. —, —, 110 S.Ct. 1190, 1195–96, 108 L.Ed.2d 316 (1990); *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 2946, 106 L.Ed.2d 256 (1989). The instructions in this case that were designed to ensure fulfillment of that constitutional requirement were fatally flawed in two respects: they are susceptible of an interpretation that jurors must unanimously agree on the existence of mitigating factors and that the jurors are prohibited from considering the defendant's allocution.

A.

I agree with Chief Justice Quinn that there was a constitutionally impermissible risk that the jurors may have thought that they had to agree unanimously upon the existence of mitigating factors before considering them in the weighing required in step three of their deliberations. Such a requirement is constitutionally impermissible. *McKoy v. North Carolina,* — U.S. —, —, 110 S.Ct. 1227, 1233–34, 108 L.Ed.2d 369 (1990); *Mills v. Maryland,* 486 U.S. 367, 384, 108 S.Ct. 1860, 1879, 100 L.Ed.2d 384 (1988).

Instruction no. 5 provided in pertinent part:

> *If* in the first two steps of your deliberations *you have made unanimous findings* that the prosecution has proven beyond a reasonable doubt that one or more aggravating factors exist and that no mitigating factors exist, or *that a mitigating factor or factors exist,* you must now decide whether the prosecution has proven that any factors in aggravation outweigh any factors in mitigation.

(Emphasis added.)

The majority asserts that the following portion of the same instruction adequately clarifies this ambiguous statement:

> If all, or one or more of the jurors believe that a mitigating factor or factors outweigh the aggravating factor or factors found to exist, then the jury shall enter a verdict of life imprisonment.

I am at a loss to see why this would dispel the impression created by the earlier portion of the instruction that the jury must make unanimous findings as to the existence of mitigating factors. The majority's interpretation would only be plausible if the jury deliberations had been structured as a three-step process in which the jury would first determine if any statutory aggravators existed, then weigh any mitigators against the proven statutory aggravators and finally determine if the death sentence was appropriate. In this case, however, the jury was explicitly instructed to follow a four-step process, which included an additional step requiring the jury to determine whether any mitigating factors existed. In this four-step process, the *existence* of mitigators is determined in step two and the *weight* assigned to those mitigators found to exist is determined in step three. The portion of the instruction that the majority relies upon governs only the weight assigned to mitigators during step

5. Moreover, in closing argument the prosecutor emphasized the number of aggravating factors.

three. If a juror has already interpreted the previous portion of the instruction to require a unanimous determination of which mitigating circumstances exist, then that juror would interpret the language relied on by the majority only to allow jurors to make their own determinations regarding the weight of those mitigating factors unanimously agreed upon in step two.

Given the ambiguity of this instruction, and the necessarily high level of reliability required in the penalty phase of a capital trial, I am unable to conclude that no reasonable juror could have interpreted this instruction in a constitutionally impermissible manner to require a unanimous finding that a particular mitigating factor existed before that factor could be taken into consideration in the weighing process.

B.

In this case the defendant exercised his right to allocution. The defendant argues that the trial court's instructions may have led the jurors to believe that they were not allowed to consider the allocution in mitigation.

The United States Constitution requires that a capital sentencing scheme allow the sentencing body to consider any relevant mitigating circumstances regarding the defendant's character and background and the circumstances of the offense. *E.g., Boyde,* at ——, 110 S.Ct. at 1195–96; *Penry,* 109 S.Ct. at 2946; *Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 1670, 90 L.Ed.2d 1 (1985). The majority acknowledges that the defendant was constitutionally entitled to have the jury consider his allocution as it might be relevant to mitigation. Maj. op. at 192.

The question in this case is whether the jurors may have interpreted instruction no. 1 to preclude them from considering the defendant's allocution. The standard is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde,* at ——, 110 S.Ct. at 1198.[6]

Instruction no. 1 states in pertinent part:

> During the course of the trial and penalty hearing you received all the *evidence* that you may properly consider to decide the case. *Your decision must be made by applying the rules of law which I give you to the evidence presented.*
>
> *It is your duty to determine the facts from the evidence you have heard during the entire trial including any additional evidence presented during the penalty phase hearing....*
>
> When I told you not to consider a particular statement, you were told to put the statement out of your mind, and you may not consider any statement in your deliberations which you were instructed to disregard. *The unsworn statement of the defendant is not evidence.*
>
> Finally, you should consider all the *evidence* in the light of your observations and experiences in life.

(Emphasis added.) In closing argument, as well, the prosecutor told the jury that unsworn statements are not evidence.

The majority simply concludes that there is not a reasonable likelihood that any juror could have applied the instruction to prevent consideration of the defendant's allocution. Maj. op. at 193. I disagree. The repeated references to the jury's duty to consider the evidence, combined with the instruction's statement that the defendant's allocution is not evidence, created an unacceptable risk that a juror would have felt prohibited from considering the allocution.

III.

I would also hold that the instructions and verdict form in this case do not comply with the requirements we enunciated in *People v. Tenneson,* 788 P.2d 786 (Colo. 1990). In *Tenneson,* we held that the pros-

6. As the majority notes, *Boyde* "used the term 'evidence' in a non-technical sense to include all material and circumstances relevant to the jury's sentencing decision." Maj. op. at 193 n. 30.

ecution must convince the jury beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors and that death is the appropriate penalty. The instructions given in the present case are inconsistent and confusing concerning the prosecution's burden in the step three weighing process.

Several of the instructions are relevant. Instruction no. 2 outlined the four-step process required by the Colorado statute. It began with a brief overview of the prosecution's burden:

> Colorado law allows the death penalty only if the prosecution ... proves beyond a reasonable doubt that:
>
> 1. One or more of the specified aggravating factors exist beyond a reasonable doubt; and
> 2. No mitigating factor or factors outweigh the aggravating factor or factors found to exist beyond a reasonable doubt; and
> 3. Death is the appropriate punishment in this case.

This statement of the law is consistent with *Tenneson.* This instruction then set forth a series of paragraphs discussing each of the four steps in greater detail. The first paragraph explained that during the first stage of the jury deliberations the jury must find beyond a reasonable doubt that at least one specified aggravator exists. The next paragraph explained that during the second step the jury must consider whether any mitigating factors exist. The paragraph explaining step three of the jury's deliberations stated in pertinent part "[i]f and only if the jury finds that one or more specified aggravating factors outweigh the mitigating factors, the jury then should proceed to the fourth step." The paragraph discussing the fourth step in the jury deliberation instructs the jury that the prosecution must prove beyond a reasonable doubt that death is the appropriate penalty.

The penalty phase instructions included other instructions explaining in greater detail the stages of the jury deliberations. Instruction no. 5 dealt specifically with the third step of the jury deliberations, but did not mention the beyond a reasonable doubt burden. It stated in pertinent part:

> If all jurors unanimously agree that the aggravating factor or factors found to exist outweigh the mitigating factor or factors or that there are not mitigating factors, then you shall continue your deliberations in accordance with these instructions.

Instruction no. 7 provided further clarification of the fourth step in the jury's deliberation. It stated "[i]f in the third step of your deliberations you have made unanimous findings that the aggravating factor or factors found to exist outweigh the mitigating factors or that there are no mitigating factors, you must now decide whether the defendant should be sentenced to death or life imprisonment."

The verdict form also omitted any reference to the beyond a reasonable doubt burden applicable to weighing aggravating and mitigating factors. It stated in pertinent part:

> We, the jury, find that there are insufficient mitigating factors to outweigh the aggravating factor or factors which have been proven by the prosecution beyond a reasonable doubt.

In *Tenneson,* we wrote "[t]he qualitatively unique and irretrievably final nature of the death penalty 'makes it unthinkable for jurors to impose the death penalty when they harbor a reasonable doubt as to its justness.'" *Tenneson,* at 791–92 (quoting *State v. Bey,* 112 N.J. 123, 548 A.2d 887, 903 (1988)). We emphasized the enhanced need for certainty and reliability in death sentencing procedures. *Id.* at 792; *see also People v. Drake,* 748 P.2d 1237, 1254 (Colo.1988); *People v. Durre,* 690 P.2d 165, 173 (Colo.1984). Although in the initial overview provided in instruction no. 2 the trial court correctly instructed the jury that they must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors, the instructions failed to include the beyond a reasonable doubt requirement in the three places where the jury was given detailed instruction as to its step three weighing delibera-

tions. The verdict form also failed to include this requirement. I would hold that those omissions created an unacceptable risk that the jury did not consider the appropriate burden.

IV.

Given the profoundly serious nature of the death penalty and the heightened reliability we have consistently required in death sentencing procedures, I would hold that each of the errors discussed above sufficiently undermines the fairness and certainty of the death sentence returned in this case to require reversal. I also agree with Chief Justice Quinn that the cumulative effect of these errors further underscores the need for reversal. I would reverse the sentence of death and return the case to the trial court with directions to impose a sentence of life imprisonment.

Justice KIRSHBAUM dissenting.

I join part IV of Chief Justice Quinn's dissent. Because the probability is great that the jury's consideration of the unconstitutional "especially heinous, cruel or depraved" aggravator rendered its verdict impermissibly suspect under the eighth amendment to the United States Constitution, the sentence of death should be vacated on that ground alone and the case remanded to the trial court for imposition of a sentence of life imprisonment.

The majority recognizes that this aggravating factor, which the jury was instructed to consider and which the prosecutor emphasized in his closing arguments, violated federal constitutional standards because it failed to provide sufficient certainty that the jury did not act arbitrarily and capriciously in imposing a sentence of death. *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Having determined that the trial court committed error of constitutional magnitude, the majority then holds that the error was harmless beyond a reasonable doubt, referring to the United States Supreme Court decision in *Clemons v. Mississippi,* — U.S. —, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), as authority for this startling conclusion.[1]

Colorado's death penalty statute requires a fact-finding jury to balance mitigating and aggravating circumstances in reaching its ultimate decision. § 16–11–103(2), 8A C.R.S. (1986); *People v. Tenneson,* 788 P.2d 786 (Colo.1990). The majority concludes that *Clemons* "is dispositive" of the issue of whether submission of a single unconstitutional aggravator to a jury requires reversal of a sentence of death. Maj. op. at 179. That conclusion is permissible only if this court properly may re-weigh evidence in the manner the Supreme Court described in *Clemons.* However, under Mississippi law the Mississippi Supreme Court apparently has authority to decide for itself whether the death penalty should be affirmed when an aggravating factor upon which the jury relied should not have been presented to the jury. *Clemons,* 110 S.Ct. at 1447. I know of no principle of Colorado law that authorizes this court to engage in the type of credibility evaluation and evidentiary comparisons contemplated by the weighing process required by our death penalty statute. The jurisprudence of this state has established that appellate adjudication does not embrace fact-finding authority. *See, e.g., People in re D.G.P.,* 194 Colo. 238, 570 P.2d 1293 (1977); *Godfrey v. People,* 168 Colo. 299, 451 P.2d 291 (1969); *Mitchell v. People,* 24 Colo. 532, 52 P. 671 (1898). Our appellate function is limited to determining whether by objective standards evidence properly admitted at trial supports a jury verdict, whatever contrary view we might have taken of that same evidence. *People v. O'Donnell,* 184 Colo. 434, 521 P.2d 771 (1974). The majority's conclusion suggests that this court possesses appellate authority to reverse a jury verdict of death based on our independent re-weighing of the evidence. I do not

1. The majority correctly concludes that the trial court's failure to give any limiting instruction with regard to the meaning of "especially heinous, cruel or depraved" cannot be cured on appeal. *See Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

find common-law or statutory support for such concept of appellate adjudication in this state.

I also find untenable the majority's conclusion that this court should and can accurately psychoanalyze the state of mind of all twelve jurors had they considered a record that contained a narrowing instruction satisfying the standards articulated in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). This conclusion appears to contradict the majority's earlier determination that because the unconstitutional aggravator had not been so narrowed it was not possible to ascertain whether the jury's verdict in fact resulted from unbridled and unrestrained passion. I fail to see how a court can accomplish by hypothesis what it cannot accomplish in fact.

The majority's assumption that a harmless error analysis is appropriate is especially untenable in light of the closing arguments presented by the People. The prosecutor basically recited legal principles of law when commenting on other alleged aggravators. When discussing the "especially heinous, cruel and depraved" aggravator, however, the prosecutor emphasized the evidence establishing the inhuman nature of defendant's conduct in brutally murdering Virginia May. In rebuttal, the prosecutor again emphasized the "hideous" nature of the defendant's bestial conduct.

Relying on *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the majority determines that because the same evidence would have been admissible to establish other aggravators, the prosecutor's references to that evidence did not constitute reversible error. *Zant*, however, arose in the context of a Georgia death penalty statute that did not contain the balancing features of section 16–11–103(2). Under our statute, juries may conclude that one aggravator so outweighs any mitigating factors that the death penalty should be imposed. It is not possible to conclude beyond a reasonable doubt that the jury's decision here did not turn on considerations of the significance of the unconstitutional aggravator alone, espe-

cially in view of the prosecutor's emphasis of the evidence in relation to that aggravator.

The defendant's conduct was hideous, as the prosecutor emphasized in his closing arguments. That historic fact is not in dispute. However, I conclude that this court cannot ascertain from the record in this case what the jury would have done had it not considered the unconstitutional "especially heinous, cruel and depraved" aggravator, much less what the jury would have done had it considered that aggravator together with a limiting instruction it never received. I also conclude that this court, in the exercise of its appellate jurisdiction, should not constitute itself as the sentencing court in every death penalty case by independently identifying and then re-weighing aggravating and mitigating factors when requested to do so by the People or by the defendant. I therefore respectfully dissent from the contrary conclusions of the majority.

I am authorized to say that Justice LOHR joins in this dissent.